McDONALD, PARKER LEE, Associate Judge.
The appellant was the defendant below and is seeking relief from a judgment in the amount of $15,202.40 following an adverse jury verdict for the appellee and against the appellant.
The appellant is a Florida corporation chartered under the Small Business Investment Act of the United States and is engaged in the business of making loans to small businesses under small business company regulations. The appellee is a Florida corporation engaged in the business of general construction.
In April of 1961, the appellee (hereinafter referred to as Bissett) was planning and *597 hoped to build and then operate a seafood restaurant on property which it owned in Fort Lauderdale, Florida. After having some difficulty in arranging for the financing, through a mortgage broker Bissett came into contact with Florida Capital Corporation. Florida Capital indicated to Bissett that it did not make construction loans but it may be interested in issuing a permanent mortgage commitent and would consider issuing a permanent mortgage on the properties after the planned improvements had been completed. Subsequent meetings between Bissett and Florida Capital resulted in an offer by Florida Capital to issue a mortgage commitment for a fee of 5% of the amount of the mortgage. There was at this time some informal conversations between Bissett and the vice-president of Florida Capital concerning construction money. At this time there was no great concern about construction money because Bissett firmly believed that he could secure construction money after the commitment had been issued.
On May the 10th Florida Capital wrote to Bissett the following letter:
“May 10, 1961
“Gentlemen:
“The Directors of this Corporation have approved your loan application in the amount of $275,000.00 payable $6,-875.00 quarterly, plus 12% interest payable monthly.
“This commitment is on a when complete basis and is subject to the following:
1. Survey specifically locating the improvements on the land to be mortgaged.
2. Seven Seas Seafood Restaurant to be built in conformity with plans and specifications of Chester W. Trowbridge, Architect, and as approved by William G. Crawford, Supervising Architect of the Florida Hotel & Restaurant Commission by Permit #1516, dated August 11, 1960, composed of 17 sheets.
3. That all regulations of public bodies having jurisdiction over such construction have given their official sanction.
4. Approval of the title to the property and the form of note and mortgage and other relevant documents by our attorney.
5. Payment of all customary closing costs.
6. Payment by you of a flat standby fee of $13,750.00.
7. This commitment expires 31 May 1962 and is renewable for an additional one year period upon payment by you of an additional standby fee at the rate of 1/2 of 1% per month.
“If this commitment meets with your approval, please contact this office immediately for instructions to close this transaction.
Very truly yours,
C. Frank Carrieri Vice President”
Apparently the letter was unsigned at this time but on May the 16th Florida Capital wrote a second letter which reads as follows :
“May 16, 1961
“Gentlemen:
“We are enclosing our Commitment to your Corporation which is self-explanatory.
“In order to avoid any misunderstanding, our permanent mortgage will include the land and all of the improvements (Restaurant), together with equipment and fixtures thereon and therein to be contained. Our mortgage will not encumber chattels such as dishes, tables, chairs, rugs and other restaurant supplies.
“I would like to call your attention to paragraph 6 of the enclosed Commitment which states ‘Payment by you of a flat standby fee of $13,750.00’. Unless this fee is paid to Florida Capital Corporation on or before the 31st of *598 May, 1961, the commitment will be null and void.
Very truly yours,
C. Frank Carrieri Vice President”
Bissett utilized the foregoing letters in an attempt to secure construction money. He was experiencing some delay and naturally was interested in having some sort of commitment from someone about a construction loan prior to paying the 5% “stand-by fee.”
Shortly prior to the deadline, Bissett contacted Mr. Carrieri, Florida Capital’s Vice President, and asked for an extension of time for the payment of the $13,750.00. He was told that this could not be done as Mr. Carrieri did not have the authority to grant an extension and it would be impossible to reconvene the Board in order to obtain the authority to extend the time for the payment of the fee.
It was at this time, according to Bissett, which must have been believed by the jury, that Mr. Carrieri stated that if Bissett accepted Florida Capital’s offer to issue a mortgage commitment and pay the sum of $13,750.00 it, Florida Capital, would procure a sufficient construction loan for Bissett through the Defendant’s own bank. Bissett testified that this offer was the deciding factor in his paying the $13,750 and that he relied on it and would not have paid the $13,750.00 in the absence of the agreement. He still expected to be able to get a construction loan at a bank of his own, but the assurance that if he couldn’t Florida Capital would, was the deciding factor. After this conversation, Bissett issued his check to Mr. Ball, the mortgage broker, who in turn paid Florida Capital the sum of $13,750.00. At this time Florida Capital gave to Mr. Ball for Bissett a letter in the form of a receipt which reads as follows :
“May 31, 1961
“RECEIVED of ROBERT J. BIS-SETT CONSTRUCTION, INC. a check in the amount of Thirteen Thousand Seven Hundred Fifty ($13,750.00)' Dollars covering payments of flat standby fee for commitment modified by letter dated May 16, 1961, copy attached hereto, for proposed mortgage-loan on the following described property:
Lots 20 and 21, Block S, Coral Ridge Country Club Subdivision as recorded in Plat Book 36, Page 30, of the Public Records of Broward County, Florida.
to 1 June 1962 on which commitment has been given conditioned upon said payment. It being understood that proceeds of such loan are not to be disbursed until improvements on said land have been completed. If such loan is not made on or before 1 June 1962, an additional payment at the rate of of 1% per month is required.
Florida Capital Corporation
By: C. Frank Carrieri Vice President”
Bissett was unsuccessful in securing a construction loan himself through one of his own banks and Florida Capital likewise was unsuccessful in securing a construction loan for Bissett. Florida Capital did make an effort in this regard, did put Bissett into contact with some banks but no construction loan was forthcoming. The evidence below indicates that there was no fault on Florida Capital’s part resulting in the inability of Bissett to obtain the construction loan, but this was apparently the result of Bissett’s financial condition, his inexperience in this particular line of construction and the fact that he was both contractor and owner. Following his inability to obtain a construction loan, Bissett made demand on Florida Capital for the return of his money and when that was denied this law suit resulted.
Bissett predicated its cause of action upon a claim that Florida Capital had breached its parol contract tó procure a construction *599 loan for Bissett. The construction loan promise was an integral and necessary part of the transaction which led to Bissett’s paying the $13,750.00.
Florida Capital insists that it was improper for the Court to receive and consider or to allow the jury to consider the testimony of Bissett concerning the alleged oral promise of Mr. Carrieri. It contends that the letters of May 10, May 1-6, and May 31, 1961, constitute the agreement and these being in writing the parol evidence rule prohibits the introduction of testimony allowed by the Court below. Bis-sett contends that the letters do not constitute the entire agreement, that it does not express the understanding between the ■parties and therefore the parol evidence rule does not apply to prevent the introduction of testimony allowed by the Court below. The appellee points out that the letters of May 10 and May 16 could not have constituted the agreement because this was a mere offer and as such was not ■accepted by Bissett. It would appear that the letter received May 31 would lend •some credence to Florida Capital’s contention, but Bissett points out that the letters of May 10 and May 16 made it necessary for a receipt to be shown the banks as proof that the commitment was valid and it should go no further than showing pay-ment.
This Court in our case of Bessemer Properties, Inc. v. Barber, Fla.App., 105 So.2d 895, 898, has approvingly quoted some textual matters which are pertinent to the problems involved Here, as follows:
“Under ‘parol evidence’ the correct rule is laid down in Volume 10, En- ■ cyclopedic Digest of Florida Reports, Section 9, page 624, as follows:
“ ‘Where a written instrument executed pursuant to a verbal agreement or negotiation does not express the entire agreement or. understanding between the parties, the parol evidence rule does not apply to prevent the introduction of extrinsic evidence with reference to matters not provided for in the writing.” 22 C.J. 1283, par. 1715; McNair [& Wade], etc., Land Co. v. Adams, 54 Fla. 550, 45 So. 492. McClure v. Century Estates, 96 Fla. 568, 120 So. 4, 10; Meinhardt Bros. & Co. v. Mode, 22 Fla. 279.
“In Wigmore’s Third Edition, Section 2430, page 98, is this language:
“ ‘(1) Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties thereto. In this respect the contrast is between voluntary integration and integration by law (post § 2450). Here the parties are not obliged to embody their transaction in a single document; yet they may, if they choose. Hence it becomes merely a question whether they have intended to do so.
“‘(2) This intent must be sought where always intent must be sought (ante, § 42, 1714, 1790), namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice. What it was intended, to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered. Thus the apparent paradox is committed of receiving proof of certain negotiations in order to determine ■ whether .to exclude them; and this doubtless has sometimes seemed to lower the rule to a quibble. But the paradox is apparent ■ only. The explanation is that these alleged negotiations are received only provisionally. Although in form the witnesses may be allowed to recite the facts, yet in truth the *600 facts will be afterwards treated as immaterial and legally void, if the rule is held applicable. There is a preliminary question for the judge to decide as to the intent of the parties, and upon this he hears evidence on both sides; his decision here, pro or con, concerns merely this question preliminary to the ruling of law. If he decides that the transaction was covered by the writing, he does not decide that the excluded negotiations did not take place, but merely that if they did, they are legally effective, and he then leaves to the jury the determination of fact whether they did take place.’ ”
Professor Wigmore in his aforesaid works in discussing the effects of receipts and releases says the following:
“§ 2432. Receipts and Releases: Bills of Lading. A receipt * * * i. e. a written acknowledgment, handed by one party to the other, of the manual custody of money or other personalty — will in general fall without the line of the rule; i. e., it is not intended to be an exclusive memorial, and the facts may be shown irrespective of the terms of the receipt. This is because usually a receipt is merely a written admission of a transaction independently existing, and, like other admissions, is not conclusive (ante, § 1058).
“But where the writing is itself the very act, as where it grants a discharge or release of a claim, or embodies a new obligation, it obviously falls within the rule, and its terms cannot be overthrown
An early American decision, Henry v. Henry, 11 Ind. 236, 71 Am.Dec. 354, expresses the foregoing in slightly different language when it stated “A mere receipt may be explained and controlled in its operation by parol evidence. A contract, as a general rule, cannot be. And where a written instrument is made to- include a receipt and a contract, it cannot, so far as it operates as a contract, be controlled by parol evidence any further than ordinary contracts may be.” (The Court would suggest anyone interested to review the annotation 70 A.L.R. 752 to give some insight into the problem of the application or lack thereof of the parol evidence rule in situations similar to the case involved.)
The lower Court was faced with the problem of two opposing views of what the “deal” entered into was. In viewing the history of the transaction in the case at bar, it appears that under the circumstances it was appropriate for the Court to allow the introduction of the testimony concerning the alleged oral agreement. The lower Court decided the transaction was not covered by the writings, was pertinent and should be submitted to the jury. When instructing the jury, the Court charged “If you believe from the evidence that the Defendant did not promise to get the Plaintiff a construction loan but at the most only promised to assist the Plaintiff in obtaining construction funds, and if you further believe that the Defendant made reasonable efforts to so assist the Plaintiff, then you must return a verdict in favor of the Defendant. If you believe from the evidence that the only agreement between the Plaintiff and the Defendant is that set out in the letters containing the permanent commitment, then you must return a verdict in favor of the Defendant.” In short, the lower Court submitted to the jury the question of what the deal was. There had been conflicting versions of this and the jury found for Bissett. The evidence could be construed to support the finding of the jury under the Court’s charges. A somewhat similar case authorizing a jury determination is the Texas case of Evers v. Arnold, Tex.Civ.App., 210 S.W.2d 270.
 The appellants strongly contends that even if Mr. Carrieri made the statements discussed above, no action by Bissett could be predicated thereon because Mr. Carrieri did not have the authority to make such statements or any such agreement. No *601 one suggests that a corporation can be bound by an act of the agent for which it does not have authority, express or implied, to act. As quoted in the case of E. O. Painter Fertilizer Company v. Boyd, 93 Fla. 354, 114 So. 444, our Court stated ■“[W]e can deduce the two tests by which it may be determined whether an act or contract is valid and binding upon a corporation: (1) Is the act or contract within the legitimate purposes of its chartered powers ? (2) Is the act done or contract entered into by an agent of the company thereunto authorized, or has such act or contract been ratified by the corporation?” Now at first blush one would think that since Florida Capital cannot issue a construction loan under its charter powers, any agreement to secure one would be beyond the power or authority of the corporation. On the other hand, the purpose of Florida Capital is to issue mortgages and mortgage commitments and one must consider whether or not an act or a promise which was for the purpose of securing this business for Florida Capital was a legitimate collateral agreement which would benefit the corporation. Mr. Carrieri was charged with the responsibility to procure business. The jury could find that Mr. Carrieri, under these circumstances, had the authority to make the promise made.
The lower Court directed the jury to enter a verdict for $13,500.00, plus interest, if they found that Bissett was entitled to anything. The appellant urges error in this indicating that certainly the mortgage commitment was worth something and at the very least the Court should have submitted the question of damages to the jury to offset any claims of Bissett by the value of the mortgage commitment. Bissett’s circumstance was similar to a person buying a trailer to haul some goods without a tractor to pull the trailer predicated upon a promise by the seller to get him one. Where this wasn’t done, he had a right to turn the trailer in and get his money back. Bissett points out that there is no evidence directly or indirectly upon which the jury could base any findings that the mortgage commitment was worth anything to Bissett without the necessary vehicle of the construction loan being attached thereto. These disputed issues were resolved and considering the entire record, this Court is of the opinion that the judgment should be affirmed.
Affirmed.
ALLEN, Acting C. J., and SHANNON, J., concur.