Albert **BROWN**, Plaintiff-Appellant,

v.

**FINANCIAL SERVICE CORPORATION, INTERNATIONAL,** a Georgia corporation, Defendant-Appellee.

No. 72–3002.

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1974.

Arnold D. Schatzman, Herbert Stettin, Miami, Fla., for plaintiff-appellant.

Carl H. Hoffman, Miami, Fla., for defendant-appellee.

Before AINSWORTH, DYER and IN-GRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

This Florida diversity case presents questions of basic contract law. Plaintiff-appellant Albert Brown filed suit against Financial Service Corporation, International (FSC), a Georgia corporation, alleging that it breached its contract to repurchase certain stock which had been issued to Brown while he was employed by the company's wholly owned subsidiary, Financial Service Corporation of America.[1] FSC counterclaimed for the balance due on a promissory note held by it and executed by Brown in November 1968 shortly after he became employed by the company. Although we fundamentally disagree with the district court's reason for granting summary judgment to FSC on Brown's claim, we affirm that decision

---

1. Financial Service Corporation of America is also a Georgia corporation, but is registered as a foreign corporation in Florida and does business there. It appears that FSCA is a licensed broker/dealer, a member of the Midwest and Boston Stock Exchanges and is engaged in the sale of mutual funds, securities and other related investments. Mr. Brown was the company's sales manager for Florida and officed in Fort Lauderdale. He was a Florida citizen at the time this law suit was filed. It is unclear from the record whether Mr. Brown was the senior FSCA official in Florida, but it is safe to say that he had a significant hand in the company's operations there.

and also affirm the lower court's summary judgment award to FSC on its counterclaim.

## I.

The operative facts are undisputed. In November 1968 negotiations between FSC and Brown culminated in Brown's employment by the company as a senior vice president and director of its subsidiary, Financial Service Corporation of America. The compensation package arranged for Brown included a $40,000 a year salary plus bonuses, a new or used Cadillac, and, most significantly for our purposes, an agreement to sell Brown 4000 shares of FSC's non-publicly held stock at $5 a share.[2] Brown began work in mid-November of 1968. In late May 1969 William Branch, FSC's assistant secretary and the person in charge of issuing the company's stock, wrote a letter to Brown concerning the 4000 shares of stock to be issued pursuant to the employment bargain. This letter summarized the ways in which the stock purchase could be financed, as well as describing the various steps necessary to finalize the transaction.[3] Enclosed with

---

2. The employment contract also stated that 1000 additional shares of FSC stock would be sold to Brown when they became available. Subsequently this stock was available at a price of $7 a share. For reasons we are unable to discern either the company failed to offer this stock to Brown or he failed to purchase it.

3. The full text of this letter is as follows:
FINANCIAL SERVICE CORPORATION
May 29, 1969
Mr. Albert A. Brown
4100 Galt Ocean Drive
Ft. Lauderdale, Florida 33308
Dear Al:
In accordance with your previously expressed interest in purchasing shares of Financial Service Corporation, International stock, we are enclosing the following forms:

| | Sign and Return |
|---|---|
| (1) Stock Purchase Agreement (2 copies) | 1 |
| (2) Promissory Note (2 copies) | 1 |
| (3) Stock Powers (1) | 1 |
| (4) Affidavit (2 copies) | 1 |
| (5) Offering Circular | Do not return |

*All items which you are to execute must be received in our office within ten (10) days from the date of this letter.* If these documents have not been returned, we will assume that you are no longer interested in purchasing the stock.
The *prospectus* mentions a price per share of $5.00. The value of FSCI stock is determined by its Board of Directors at regular intervals. The price per share of this offering to you was set at $5.00 on July 1, 1968.
*The Stock Purchase Agreement* outlines the terms and conditions of your investment in FSCI stock. Please read it carefully.
There are several methods which can be used to pay for your FSCI stock.

1. Obviously, a cash payment will be the least expensive to you. If you choose this method, please return your check with the other documents.
2. Financing through a local bank connection may be your next choice. It is probable that more attractive terms are available locally, plus the advantage of strengthening your personal banking relationship. If this method is to be used, a check should also accompany the above executed documents.
(R–721)
3. You may wish to avail yourself of the financing plan available through the Citizens and Southern Bank in Atlanta, Georgia, which is described on the last page of your Stock Purchase Agreement, Appendix A.
4. Finally, a combination of the above can be arranged.
If you select option 3 or 4, you must execute the *Note* and *Stock Powers* which are enclosed. The Note evidences your agreement to pay the balance of the purchase price not paid in cash at the time of your purchase.
The security for the Note will be your FSCI stock. Therefore your stock certificates will be held as collateral until the Note is paid in full. A *Stock Power* is included for each certificate that will be issued.
The *Affidavit* evidences your understanding of the restrictions placed on the transferability of the shares you propose to purchase. This document is necessary because of State and Federal security laws.
When you have executed these documents and returned them to us as outlined above, we will issue certificates in your name and either mail them to you or deliver them to the Bank depending on the payment method you select.
Very truly yours,
/s/ William H. Branch, Jr.
Assistant Secretary

this letter was the Stock Purchase Agreement which set forth the specific terms of the purchase. This document is the source of the present difficulties.

The controversial provision deals with the disposition of the stock when the purchaser ceases to work for the company. For ease of reference we will call this the repurchase provision, and it provides:

"When, for any reason, Representative's employment with the Company terminates, the Company shall have one year from the date of such termination to repurchase any shares sold under this agreement for their fair market value at the time of such repurchase, which fair market value shall be the price adopted for the Company's stock by the Board of Directors of the Company in the most recent meeting of the Board preceding the termination of Representative's employment at which such action was taken. This option to repurchase shall be exercised by the Company sending written notice of its intent to

exercise to Representative at his last address as shown on the Company's records. Such notice shall specify the time, place, and manner in which the repurchase shall occur. Thereafter, at the time and place and in the manner so specified the Company shall make payment for the stock to be repurchased in cash or by check and Representative shall, immediately upon making of such payment, deliver to the Company valid title to said stock and all certificates evidencing said stock free of all claims, liens, and encumbrances of any nature whatever."

In response to Branch's letter Brown called Branch sometime between May 29, 1969 and June 6, 1969, to discuss the stock purchase transaction. Although the content of this conversation is in dispute, all agree that it took place and that it precipitated a letter from Brown to Branch which accompanied the signed stock purchase agreement when it was returned, via the mails, to Branch's office in Atlanta. This cover letter, dated June 6, 1969, discussed several matters relating to the purchase,[4] but the signif-

---

4. This letter reads:
June 6, 1969
Mr. William Branch
Financial Secretary
Financial Service Corp. of America
Financial Service Building
148 Cain Street
Atlanta, Georgia 30303
Dear Bill:
As per your letter of May 29, 1969, I am indicating by the enclosures—stock purchase agreement and affidavit—my desire to purchase the 4,000 shares of stock indicated on the agreement. I have not returned the promissory note or stock powers because I should like very much to finance this purchase locally if I can. I have just not had the time this week to do anything along these lines—but I am certainly intent on purchasing this stock through a loan whether it be through a local banking institution or through an Atlanta bank.
I wanted also to confirm the discussion you and I had yesterday on the phone on questions that I had raised. Referring to the termination of employment clause in the stock purchase agreement, while it is stated that the company shall have one year to repurchase any shares, we agreed that the company

would repurchase almost immediately after termination. We also agreed that the market value of the stock was actually determined twice each year—in June and December. I referred to this item because of the reference in that same clause No. 3 in the stock purchase agreement which refers to the meeting of the Board "at which such action was taken".
Furthermore, we also agreed that the 15% charge referred to in clause No. 1 of the agreement for collection by an attorney would only be in effect if the principal and interest of the note were not collectible.
We also agreed that if I were to anticipate payment of the note or of any portion of the note, I would receive a corresponding refund or reduction of interest charges.
Referring to paragraph No. 4, miscellaneous, we agreed that the reference to either party having the right to offset or cancel existing indebtedness, referred to a standard approach to the cancelling of indebtedness by offsetting it with other sources of dollars.
(R–725) The only other comment made in our discussion was that this stock purchase agreement was different from the one issued to some men in the company which called for repurchase of a portion of a man's stock hold-

icant element at this point is the reference to the repurchase or termination of employment clause; Brown wrote as follows:

"I wanted also to confirm the discussion you and I had yesterday on the phone on questions that I had raised. Referring to the termination of employment clause in the stock purchase agreement, while it is stated that the company shall have one year to repurchase any shares, we agreed that the company would repurchase almost immediately after termination. . . ."

Branch received Brown's letter but took no further action other than to issue the 4000 shares of stock once the financing had been arranged.[5]

In the fall of 1969 the relationship between Brown and FSC began to deteriorate and it was agreed, on what appear to be rather amicable terms, that Brown's employment would end on January 15, 1970. For reasons not entirely clear and unnecessary to relate in order to resolve the present appeal, Brown and FSC encountered problems in settling up following his termination. Although FSC was at one time willing to repurchase the stock for $10 a share and hold the proceeds until a final determination was made of amounts allegedly owed to FSC by Brown, Brown would not agree to this offer. FSC subsequently decided that its financial condition was such that it would not repurchase the stock. Left with 4000 shares of apparently un-

marketable stock, Brown filed suit in November 1970 seeking damages from FSC for the alleged breach of its contract to repurchase the stock.[6] He also alleged that the company had failed to sell him the additional 1000 shares mentioned in the employment agreement, thus reasoning that FSC was liable for the difference between the purchase price of this stock and the price due upon repurchase. In addition to denying liability FSC counterclaimed for $11,600, asserting that Brown was liable for this amount as the unpaid balance on a promissory note executed by Brown and held by FSC.

After the parties stipulated that the case was a proper one for summary judgment, the trial court granted FSC's motion in Brown's suit and in its counterclaim. The court decided that the parol evidence rule precluded it from considering anything other than the stock purchase agreement to determine whether FSC had a duty to repurchase Brown's stock. The court reasoned as follows:

"Upon reading and analyzing paragraph 3 [the repurchase clause] the Court is convinced that the company was not obligated to repurchase but merely possessed an option. There is no ambiguity in the stock purchase agreement; its terms are clear. The cover letter of June 6, 1969 and any conversations between Brown and Branch prior to [or] contemporary to the stock purchase agreement may not

ings if he did not earn specific or required amount of dollars during a prior twelve-month period. This arrangement did not apply to me in that this agreement calls for the repurchase by the company at a fair market value at the time of such repurchase.
By the way, I am including two copies of the stock purchase agreement since I would like a completed one returned to me for my files.
Kindest regards,
FINANCIAL SERVICE CORP.
OF AMERICA
ALBERT A. BROWN
Senior Vice President
AAB/jp
Enclosures

5. The purchase of the 4000 shares was financed by Brown's note for $20,002. The stock served as collateral for this loan and immediately after its execution FSC discounted the note with an Atlanta bank. In March 1970, when FSC offered to repurchase Brown's shares, the note had a payoff of $18,059.87.

6. Although not before us on this appeal there is a related suit filed by Financial Service Corporation of America against Brown for damages allegedly sustained while Brown was in the company's employment.

vary its terms. The parol evidence rule . . . precludes varying an unambiguous written agreement by evidence of a contemporaneous oral understanding. . . ."

Rejecting Brown's defense that he was not liable for the balance due on the note because FSC had breached the employment agreement of which the note was an integral part, the court held for FSC on its counterclaim.

The significant issue on appeal is, stated broadly, whether the trial court erred in holding that FSC did not have a duty to repurchase the 4000 shares of stock. Although we take an altogether different view of the case than did the trial court, we reach the same result regarding FSC's obligation to repurchase. Other issues raised concern FSC's asserted liability on the 1000 additional shares of stock and the propriety of the court's holding on the counterclaim. Because of our resolution of the repurchase issue against Brown, there is no need to consider his contention relative to the 1000 shares, and we affirm without further discussion the court's holding that Brown is liable on the promissory note.[7]

## II.

▆ The flaw in the trial court's analysis is its implicit conclusion that the stock purchase agreement represented the complete agreement of the parties and that therefore Brown's cover letter had no legal significance according to the parol evidence rule. The parol evidence rule is a rule of the substantive law of contract, and its purpose is to preserve the sanctity of a written agreement once it is determined that the writing fully states the agreement of the parties. *See* South Florida Lumber Mills v. Breuchaud, 51 F.2d 490 (5th Cir., 1931), cert. den., 284 U.S. 659, 52 S.Ct. 37, 76 L.Ed. 558; Everglade Lum-

ber Co. v. Nettleton Lumber Co., 111 Fla. 333, 149 So. 736 (1933); Sears v. James Talcott, Inc., 174 So.2d 776 (Fla. App.1965). Of necessity then the first question is whether the writing fulfills this function so as to be an integration of the parties understanding. Carolina Metal Products Corp. v. Larson, 389 F. 2d 490 (5th Cir., 1968); Florida Capital Corp. v. Robert J. Bissett Const. Inc., 167 So.2d 595 (Fla.App.1964); *see* G. Grismore, Principles of the Law of Contracts, § 94 (J. Murray ed. 1965). To answer this question a court should consider the writing as well as the circumstances surrounding its execution, Florida Capital Corp. v. Robert J. Bissett Const. Inc., *supra,* at 599, and parol and extrinsic evidence may be used in making this determination. Carolina Metal Products Corp. v. Larson, *supra,* 389 F. 2d, at 493. We hold that Brown's cover letter should have been considered as a part of the parties' agreement concerning the terms of the stock purchase. *See* Johnson v. Smith, 84 So.2d 722 (Fla.1956); Holcomb v. Bardill, 214 So. 2d 522 (Fla.App.1968).

▆ Without doubt a covering letter may constitute a part of the total agreement. Gateway Co., Inc. v. Charlotte Theaters, Inc., 297 F.2d 483 (1st Cir., 1961); *see* Johnson v. Smith, *supra*; Fraser v. Lewis, 187 So.2d 684 (Fla. App.1966). Here the cover letter itself clearly establishes that its purpose was to summarize in writing the content of a telephonic conversation concerning the purchase agreement; the cover letter specifically discusses terms of the stock purchase agreement. Moreover, the letter not only accompanied but was a cover to the signed stock purchase agreement when it was returned to Branch's office in Atlanta, And finally, Branch realized that at least to some extent the letter modified the terms of the pur-

---

7. As to the 1000 shares Brown claims that he should have been issued this stock at $7 a share and that the company was obligated to repurchase at $10 a share. *See* note 2, *supra.* He would then have realized a $3000 profit, and it is this amount which he claims

as damages. Since we hold that there is no obligation to repurchase, his claim is without merit. According to the district court's opinion FSC is willing to sell him 1000 shares at $7 a share.

chase agreement. In short, the existence of the cover letter and the circumstances surrounding the execution of the stock purchase agreement preclude the conclusion that it was intended by the parties as the final memorial, the integration, of their understanding concerning the terms of the stock sale. Consideration of the cover letter would not, therefore, violate the parol evidence rule because the cover letter was a part of the contract. For this reason it was erroneous for the trial court to reject the cover letter when determining the rights and liabilities of the parties under the purchase agreement.[8]

### III.

■ The decision that the parties' contract is embodied in both the cover letter and the stock purchase agreement does not, of course, end the matter. For now there are arguably inconsistent contractual provisions dealing with the same subject matter—that is, the rights and duties of the parties on the purchaser's termination of employment. We agree with the trial court that the stock purchase agreement standing alone does not impose a duty on the company to repurchase Brown's stock. The problem is that the cover letter says "we agree that the company would repurchase almost immediately after termination." Interpreting these words in the manner urged by Brown would lead to the conclusion that this language means that the company had an obligation to repurchase the stock and that this repurchase must occur immediately after termination. Two duties are thus created: (1) the duty to repurchase; and (2) the duty to do so immediately after termination. Obviously this interpretation is in direct conflict with the interpretation of the agreement as giving the company an option to repurchase but imposing no affirmative duty.

■ There is, however, another interpretation which could be accorded to this language from the cover letter. Rather than treating this statement as creating two duties, it could be interpreted as imposing only a duty on the company to exercise its option immediately on termination. In the circumstances of this case it is this interpretation which we adopt as representing the intention of the parties at the time this contract was consummated.[9] We reach this conclusion on the basis of the following analysis in which we apply several well estab-

8. Perhaps our conclusion in this regard will be clearer if we backtrack to the question of whether there was a contract at all. Branch's initial letter was clearly an offer to sell 4000 shares of stock to Brown. This letter included the terms of the purchase and covered such things as offering price, the number of shares, the methods by which the purchase could be financed, and other relevant considerations concerning the transaction. If Brown had signed the stock purchase agreement at this point and returned it without further action, then FSC would have had an acceptance of its offer. But Brown did not do this; instead he called Branch and discussed with him certain aspects of the purchase, including but not limited to, what would happen in the event he left FSC's employment. Brown's cover letter is an outward manifestation of his failure to assent unequivocally to the terms of the stock purchase agreement. As such, Brown's action of signing the purchase agreement and attaching his cover letter was nothing more than a counter offer. FSC would have been warranted in refusing to issue the stock to Brown until it had his assurance that he agreed without reservation to the terms of the purchase agreement. But Branch, although realizing that Brown did not agree completely, issued the stock to him anyway. This act was legally an acceptance of the terms of Brown's counter offer. It is clear then that the parties contract includes both the signed stock purchase agreement and the cover letter.

9. As Judge Tuttle once noted:
"It is axiomatic that the first task of a court in contract interpretation is determining from the agreement itself and the surrounding circumstances what the intent of the parties was. If, after examining all these sources of information, it is still not possible to determine the intent of the parties, courts can rely on rules of law which purport to determine what, in certain circumstances the parties intended, when, in fact, no one really knows what was intended. . . ." Southern Bell T & T v. Florida East Coast Ry. Co., 399 F.2d 854, 856 (5th Cir., 1968).

lished principles for the interpretation and construction of contracts.

█ The first principle is that in interpreting contractual language to determine the rights and obligations of the parties to the agreement the contract must be considered as a whole in an effort to give meaning to all of its provisions. *See* Union Central Life Ins. Co. v. Neuhoff, 157 Fla. 98, 24 So.2d 906 (1946); Blackshear Mfg. Co. v. Fralick, 88 Fla. 589, 102 So. 753 (1925). *See generally* 3 Corbin on Contracts, § 549 (1960). Florida courts have long recognized that "[i]f clauses in the instrument are repugnant to each other, they must be reconciled, if possible . . . ." McNair & Wade Land Co. v. Adams, 54 Fla. 550, 45 So. 492, 493 (1907). To interpret the language in Brown's letter as creating a duty in the company to repurchase his stock would render completely nugatory one of the crucial provisions of the document which he signed and returned to FSC. We would have to totally disregard the language in the purchase agreement conferring an option to the company to repurchase. By interpreting the disputed language in Brown's letter as going only to the time of repurchase rather than establishing such a duty, we afford meaning and significance to all parts of the contract. This interpretation also fulfills our duty to reconcile provisions which at first glance appear repugnant to each other.

█ The principle that conflicting provisions should be reconciled in order to give meaning to all parts of the contract might not warrant interpreting Brown's language as we have. Another established rule of contract interpretation, however, is that courts may look to subsequent action of the parties to determine the interpretation that they themselves placed on the contractual language. LaLow v. Codomo, 101 So.2d 390 (Fla.1958). The conduct of both parties subsequent to Brown's termination leaves us convinced that neither FSC nor Brown believed that the company had an affirmative duty to repurchase his shares.

The voluminous record made on the parties' cross-motions for summary judgment is replete with correspondence from Brown to FSC and vice versa. A good portion of these communications deal directly with the disposition of Brown's stock. Understandably since Brown would have received $40,000 from the sale, he was anxious for this to occur so that he could retire the note [10] negotiated to finance the purchase in the first place. But none of his many letters exhorting the company to hurry up and repurchase his stock speak in terms of an affirmative obligation on the part of FSC. Likewise, when FSC offered to repurchase and hold the proceeds until the final accounting was completed, the offer spoke in terms of FSC's right to repurchase instead of a duty to do so.[11] Brown even mentioned in two letters to two different officers of FSC that he might hold the stock until the company went public. The extensive correspondence between Brown and FSC simply does not support the interpretation now sought by Brown. Considering the contract as a whole, the circumstances surrounding its execution, and the conduct of the parties subsequent thereto, our conclusion is that this contract does not impose a duty on FSC to repurchase the 4000 shares of stock issued to Brown.

The judgment of the district court is affirmed.

---

10. *See* note 5, *supra.*

11. We agree with FSC's statement in its brief that this offer, made on March 12, 1970, to repurchase was not an attempt to exercise its option but was only an effort to resolve its dispute with Brown.