81 So.2d 514 (1955)
CITY OF GAINESVILLE, a Municipal Corporation, Appellant,
v.
BOARD OF CONTROL of the State of Florida, a body corporate, Appellee.
Supreme Court of Florida. En Banc.
June 22, 1955.
*515 Lazonby, Dell, Graham & Mills, Gainesville, for appellant.
Richard W. Ervin, Atty. Gen., Frank J. Heintz and Wm. C. Morris, Asst. Attys. Gen., for appellee.
THOMAS, Justice.
The City of Gainesville filed in the Circuit Court of Leon County a complaint containing a prayer for a decree declaring "the legal rights and obligations of the respective parties [the city and the Board of Control] in dispute arising from [a] contract of 1905, and for such other * * * relief as the premises may require."
We now condense the material allegations upon which the city relied as bases for the relief. From a time prior to the year 1905 the city in a proprietary capacity has continually operated its waterworks and charged rates for the service. On 19 July 1905 a committee of citizens of Gainesville and the five then members of the Board of Control entered an agreement by which the committee undertook to "`cause water to be furnished for the use of the * * * University * * * without charge.'" The purpose of the undertaking, which was coupled with other promises to donate land, provide temporary housing for students and so on, was to induce the Board of Control and the State Board of Education, the bodies charged with choosing a site for the University of Florida, to locate the university in Gainesville. In the agreement the parties of the first part were designated simply "a committee of the citizens of the City of Gainesville." The university was established in Gainesville and has since remained there.
According to the bill, the city never ratified the contract, nevertheless, it did until 1 October 1950 supply water to the university without charge. On 5 June 1950 the city commission adopted a resolution providing that effective 1 October 1950 the university would be charged for water at the rate of 15¢ per thousand gallons.
In the complaint is the averment that in 1948 and 1949 the city expended a large sum of money in the installation of a water treatment plant and to finance the project issued revenue certificates and pledged the receipts of the utility to the payment of the obligation. Loss of revenue by reason of the large amount of water now supplied *516 to the university "renders * * * the waterworks * * * incapable of producing sufficient revenue * * * to retire principal and interest charges on loans which [the city] must obtain to finance improvements and extensions * * *."
To continue with the analysis of the complaint: The enrollment at the university in 1905 was one hundred thirty-five and in 1950 had increased to more than eleven thousand. Subsequent to the effective date in the resolution of its commissioners, the city sent to the university bills for water consumed which the university refused to pay.
Hence the dispute.
On the one part it is contended that the city is bound to furnish water as long as the university remains at its present site; on the other, that the contract was void from the beginning and, if not, the "spirit and intent of said agreement was long ago fully discharged" and the "agreement has now become void as a contract to continue in perpetuo." (Italics supplied.)
We attach no importance to the phenomenal growth of the university as itself a reason to relieve the city of the burden. From a moral standpoint it seems to us that the inducement to secure the advantage of a university of one hundred thirty-five students is shown to have been justified by the presence of a university with eleven thousand. So, were we to stop here we would hold that the citizens in 1905 struck an excellent bargain and that the present size of the institution is all the more reason the city should be held to it.
But we must decide the controversy upon the legal points involved.
In his decree the circuit judge reviewed the history of institutions of learning in the State and the purpose in enacting Chapter 5384, Laws of Florida, Acts of 1905, commonly called the Buckman Act, F.S.A. §§ 239.01 et seq., 240.01 et seq., 241.01, 241.03, 241.21, 241.40, 241.41, 242.33, 242.34, 242.37 to 242.39, to establish a University of Florida and to create a Board of Control which should act in conjunction with the State Board of Education in selecting a location for the institution. Various cities of the State were attempting to become sites for the university, and in this competition the citizens of Gainesville, to whom we have referred, evidently took a lively, and clearly successful, part.
The circuit judge thought there could be no serious contention that the city had not either authorized the contract in the first place, or ratified it when it honored the agreement for about fifty years. While he felt that a city could not be estopped to assert the invalidity of a contract that was ultra vires, he found that the fact that the municipal officials, as well as the members of the Board of Control, considered that the city was acting within its powers highly "persuasive to the conclusion that the City did have power to make the contract."
The city, of course, was the creature of the legislature. Under the Constitution the legislature has the "power to establish, and to abolish, municipalities to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time." Section 8, Art. VIII, F.S.A. Constitution of the State of Florida. So the power in the City of Gainesville, and the other cities of Florida, was reposed by the legislature under the Constitution. Now let us look at the Buckman Act, as the circuit judge did, to ascertain the attitude of that body, whence the power of the city sprung, toward donations by cities to induce the location of such institutions within their boundaries.
By the Buckman Act the legislature abolished The Florida Agricultural College at Lake City, The West Florida Seminary at Tallahassee, The White Normal School at DeFuniak Springs, The East Florida Seminary at Gainesville, The South Florida College at Bartow, and The Florida Agricultural Institute in Osceola County, and created and established the University of the State of Florida and The Florida Female College. The Board of Control was created by the Act and it and the State *517 Board of Education were "vested with an absolute discretion", Acts 1905, c. 5384, § 17, to be exercised, however, within certain considerations detailed in the law, to determine the location of the University of the State of Florida. Since some of the cities in which institutions were then located would upon action of the boards lose those institutions, provision was made for refund to the cities from which institutions would be moved of contributions made from their treasuries to the schools. For instance it was stipulated: "And in case the said city of Gainesville [site of The East Florida Seminary] shall not be selected by said Boards as one of the places for the location of one of said institutions, then the said Board of Education shall refund to the said City of Gainesville out of the assets and property of the abolished institution located at such place, so much of the lands and property of the same, or its equivalent at its then value, as was donated to the said State by the said City of Gainesville * * *." Acts 1905, c. 5384, § 18.
It was provided that if Tallahassee, where The Florida State College, formerly designated The West Florida Seminary, was then located, should not be selected as a site for one of the new institutions under the plan, The Florida State College having been abolished by the Act, the State Board of Education, upon returning to the city any property, delivered by it for use of the school, should charge the city a proportion of any money required to be paid under Section 325 of the Revised Statutes of Florida, 1892, which the city had not paid. Turning to this section we find that a seminary for Florida west of the Suwannee was located in Tallahassee on condition that the city convey certain property to the Board of Education and "that the said city, by its proper authorities, * * * guarantee to said board of education the payment of the sum of two thousand dollars per annum forever * * *." (Italics supplied.)
So in the Buckman Act and in Section 325 of the Revised Statutes of Florida, the legislature, creator of municipalities, recognized, approved and, at least in some instances, required contributions from city treasuries of monies as a condition to the establishment and maintenance of institutions of learning within their borders.
Further evidence of the attitude of the legislature with regard to such donations is found in Chapter 5498, Laws of Florida, Acts of 1905, expressly empowering the City of Gainesville to issue bonds for such amount as the city council should determine "for the purpose of securing educational advantages and facilities in or adjacent to such city." F.S.A. § 282.01.
And as late as 1953 the legislature in a footnote to Item No. 62 of the appropriation bill "*Provided that none of these monies shall be used to purchase water from the City of Gainesville." Chapter 28115, Laws of Florida 1953, F.S.A. § 282.01, item 62. Of course, we realize that this was long after the promise of the citizens' committee was made but it does indicate to us that the legislative intent forty-eight years afterward harmonized with the pattern we think was set by the acts to which we have referred.
By the express terms of the Buckman Act the Board of Control was given the power "to receive donations" and we construe this provision to authorize acceptance of donations by the City of Gainesville. We have been directed to no provision of the city charter, expressly granting to the city the power to enter such an agreement as was executed by the "committee of citizens." Nor has our research revealed express authority so to contract.
After a careful study of this record, we conclude that the whole pattern for reorganizing and maintaining the educational system offered an opportunity for legal contributions by cities from their funds in order to secure to the citizens the obvious advantages of having institutions located in their midst. True, no express grant of power so to contribute appeared in the Gainesville charter but it was properly implied from the powers expressed.
A municipality can exercise the powers expressly granted and such powers *518 as may be implied from or as may be incident to those granted. State ex rel. Cole v. Keller, 129 Fla. 276, 176 So. 176.
We think that the power to expend money of the city by furnishing a utility as an inducement to establishing a university in the city is inherent in the powers granted to the City of Gainesville. Certainly the very purpose of a municipality is to further and foster the welfare and prosperity of those who constitute its citizenry. Such expenditures must be kept within bounds so that public funds may not be advanced to promote purely private enterprise. State v. Town of North Miami, Fla., 59 So.2d 779. But such is not the case here. State v. Board of Control, Fla., 66 So.2d 209.
It is the rule that if a city exceeds its powers the legislature can ratify what has been done beyond the scope of the powers actually granted, if it could have legalized it initially. Ebersbach Const. Co. v. Charles Ringling Co., 100 Fla. 1270, 131 So. 148; Newman v. City of Opelika, 224 Ala. 70, 139 So. 247; 10 McQuillin, Mun. Corps. 3rd Ed. Sec. 29.109.
The donation was, in effect, one for the benefit of the State, as well as the city, and was made to agents of the State with apparent sanction of the State. This, of course, would apply to any city offering a similar inducement. And there is nothing innately wrong with the donation. We would have to hold it of such character on the ground that no express power in that regard was given and none was given from which the power could be implied or to which the power to spend was incidental. We cannot find in the history of the transaction such defects or in the law such a lack that would justify this absolute decision. Not only do we reject this conclusion but we think the action of the legislature in dealing with the educational system for half a century manifested a sanction by that body of the action of the city  or on behalf of the city.
We end the discussion on this point by remarking that in our opinion the commitment was not void; that it was ratified both by the city and the State.
Then we come to the appellant's second question: Whether the city agreed to furnish water to the university without charge "in perpetuity"?
Having concluded that by its action the city honored the agreement of the citizens' committee and made the committee's promise its own, we need, in treating of this question, only to determine whether the contract was one to last forever, in perpetuity, or ad infinitum which appellant considers synonymous.
The appellant is candid in the statement that it was not suggesting that there "was no connection between the negotiations of the Citizens' Committee and the furnishing of water to the University * * *." But the appellant insists that it does not follow that the city intended to do that "in perpetuity without charge." It is not clear to us just where it could be said that the obligation, once ratified, would end.
We do not think that the circumstances considered as a whole warrant the construction that the obligation was to exist perpetually, or forever. The time was to be measured by the existence of the university in Gainesville. We take judicial notice of the location as permanent but we do not indulge the clairvoyance that it will be perpetual. Herculaneum and Pompeii were permanent but history records that they were not perpetual.
We do not dare or wish to anticipate or apprehend that misfortune or disaster will overtake either the University of Florida or the City of Gainesville or that circumstances will bring about the removal of the institution from its present site but we do say that the physical situation is not so inexorably fixed that the contract can be condemned as one to last forever.
The contract contemplated a free service so long as the university remained in Gainesville, a continuing consideration being the exchange of the service for the continuing advantage. The life of the contract *519 is unalterably `connected' with the existence of the university as presently located. We find nothing in the record to support the position that the city was bound only to furnish water as long as it could afford it, or until some arbitrary period subsequently to be determined.
In concluding our observations on the second question we have decided the last, and third, one in which the appellant asks whether the city has now discharged its obligation even assuming that the city agreed to furnish water for an unspecified time.
Affirmed.
DREW, C.J., and TERRELL, SEBRING, HOBSON, ROBERTS and THORNAL, JJ., concur.