SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Appellant,

v.

FLORIDA EAST COAST RAILWAY COMPANY, Appellee.

No. 25440.

United States Court of Appeals Fifth Circuit.

Aug. 29, 1968.

Gerald Bard Tjoflat, Earl B. Hadlow, Jacksonville, Fla., for appellant, Mahoney, Hadlow, Chambers & Adams, Nathan H. Wilson, Jacksonville, Fla., of counsel.

Chester Bedell, Robert P. Smith, Jr., Jacksonville, Fla., for appellee.

Before POPE*, TUTTLE and CLAYTON, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal involves a dispute as to the terminability of a contract which the two parties entered into in 1917, and

* Of the Ninth Circuit, sitting by designation.

which contains no express term during which it was to run. Florida East Coast Railway Company (FEC) now seeks to terminate, and has refused to abide by its terms since March 1, 1965. Southern Bell brought this action in the district court seeking enforcement of the agreement. The district court denied Southern Bell's claim and entered a final judgment upholding FEC's right to terminate the agreement and dismissing Southern Bell's complaint.

The basic issue for determination is whether the agreement, which contains no express terms as to duration, is terminable by either party upon giving reasonable notice or whether it shall continue in force for an indefinite period.

The contract establishes detailed procedures and specifications for the placement of Southern Bell's telephone and telegraph lines over and under FEC's tracks.[1] Before FEC's chief engineer will grant approval of a placement, the plans are submitted to him for his review. In this manner, FEC is able to insure that Southern Bell's line placements do not interfere with the railroad's operations. In addition, the agreement provided for Southern Bell's indemnification of any damage suffered by FEC as a result of the line crossings. It also provides indemnification for any damage resulting from crossings that had already been made when the contract was executed. Southern Bell pays no money to Florida East Coast Railroad for these crossings.

Without the agreement, Southern Bell could still obtain the right to cross the railroad by invoking statutory eminent domain procedures.[2] In addition, at the time the agreement was signed, Southern Bell claimed a common law right to cross the railroad without its approval if made at a "public crossing." Therefore, although Southern Bell could cross FEC's land without the agreement, the contract avoids the need for continuous litigation (there are now over 1,000 such crossings) and establishes orderly procedures governing the many questions which could arise out of the compelled relationship between the two parties.

The agreement has worked well, and there seems to have been only one incident, in 1930, in which there was a dispute and that was resolved. Now, however, FEC wants out of the agreement. Although there is no evidence in the record why they do, it appears that FEC has offered to enter into a new agreement with Southern Bell on substantially the same basis as before, except that Southern Bell would now pay compensation to FEC for the crossings at the same rate charged other utilities for their crossings. In addition, Florida East Coast has complained that the rapid expansion of the number of such crossings has thrown an intolerable burden on the railroad. Therefore, it does appear that a major (if not the sole) motivating force is FEC's desire for additional revenue to compensate it for its alleged increased cost due to the expansion in the number of such crossings. Since FEC terminated the agreement, the parties have agreed to a number of additional crossings at a cost to Southern Bell of $50 for the first year and $20 for each succeeding year for each crossing, subject to a final accounting according to the outcome of this litigation.

The agreement, by its express terms, does not state when, how, or even if, it can be terminated. The district court found that the contract is silent as to whether and when it could be terminated by either party.

---

1. Approximately 88% of the lines are now underground.

2. Florida Stats. § 73.161 (1967), F.S.A. Substantially the same provisions were in effect when the agreement was signed in 1917.

▪ It is axiomatic that the first task of a court in contract interpretation is determining from the agreement itself and the surrounding circumstances what the intent of the parties was. If, after examining all these sources of information, it is still not possible to determine the intent of the parties, courts can rely on rules of law which purport to determine what, in certain circumstances the parties intended, when, in fact, no one really knows what was intended or that the parties even thought about the matter. What that presumption is, according to Florida law, is an important matter because, as will be seen, an examination of the contract and its surrounding circumstances makes it very difficult to conclude what the parties intended as to how the contract could be terminated.

Southern Bell contends that the language of the contract and the circumstances surrounding its making demonstrate that the parties intended the contract to have an indefinite duration. Hence, it would not be terminable at will by either party,[3] and there is no need to rely on legal presumptions to ascertain intent.

Southern Bell complains of the district court's judgment which was that, inasmuch as Florida law avoids conferring a right in perpetuity unless it is compelled by the *unequivocal* language of the contract to do so, and there was no such language here, the contract could not be construed as continuing indefinitely.

FEC says no evidence was presented which would show an intention to create an agreement of indefinite duration. It contends that in such cases (where no period of duration is expressed or can be implied from the nature of the contract or its surrounding circumstances) the Florida law allows the contract to be terminated at will upon the giving of reasonable notice.

Southern Bell cites five examples in the language of the agreement and contemporaneous correspondence which indicates an intent that the contract was not of limited duration.

First, the agreement states that "the parties hereto deem it to their mutual interest and advantage to make and enter into an agreement with respect to such crossings as may heretofore have been and *will hereafter be made* * *" (Emphasis added.)

Second, the agreement also says "That the Railway Company will * * * grant unto the Telephone Company the right * * * to construct its said telephone wires across said right of way * * * *whenever* in the construction of telephone lines it may be necessary * * *." (Emphasis added.)

Third, the agreement states that "in the event the Telephone Company shall *at any time hereafter* desire to effect a crossing * * * such crossings shall be deemed to be covered by this agreement * * *." (Emphasis added.)

Fourth, a letter from FEC's general counsel to Southern Bell's general counsel, written before the agreement was finally signed, stated:

"I imagine that we will have no serious difficulty in arriving at a general contract to cover *all cases which may hereafter arise.*" (Emphasis added.)

Fifth, additional evidence offered by Southern Bell to prove that the parties intended a contract of indefinite duration included a letter from FEC's vice president to Southern Bell's general counsel, accompanying the signed contract, which stated:

"In connection with the above mentioned subject, I attach hereto a fully executed copy of contract entered into with respect to wire crossings hereto-

---

**3.** Southern Bell admits that if FEC can terminate the contract that the notice it received was adequate.

fore installed *or that will hereafter be made by the Southern Bell * * *"* (Emphasis added.)

From this language, Southern Bell concludes that the parties had no definite termination date in mind and did not intend the contract to be of limited duration. On the contrary, the parties intended and purposefully bargained for an indefinite term.

The fact that a long duration of a specific number of years was not mentioned is explained by Southern Bell on the grounds that there was no way of estimating when the "object of their agreement will have been fulfilled."

Furthermore, Southern Bell says that if the contract was understood to be terminable at will, it would have been a nullity and neither party would have signed it.

Finally, Southern Bell notes, as has already been stated, there is no language in the agreement which gave FEC the right to terminate at will.

FEC does not directly answer Southern Bell's arguments based on the language of the agreement and the related documents. Instead, FEC notes that the agreement *contains no clause as to expiration* and simply concludes, without explaining what the language quoted above might mean if it disagrees with Southern Bell's interpretation, that the *absence* of a duration or terminability clause means that the parties intended the agreement to continue only so long as the parties were satisfied with it. When the agreement was no longer satisfactory, it could be terminated.

The district court held that "Construction of a contract conferring a right in perpetuity is to be avoided unless compelled by the unequivocal language of the contract. Freeport Sulphur Co. v. Aetna Life Insurance Co., 206 F.2d 5 (5 Cir., 1953); Fla.-Ga. Chem. Co., Inc. v. National Laboratories, Inc., 153 So.2d 752 (Fla.App.1963);

Collins v. Pic-Town Water Wks., Inc., 166 So.2d 760 (Fla.App.1964) * * * No language in the contract provides that the option given to Southern Bell should exist perpetually. No other evidence before the court reflects such a purpose on the part of either Southern Bell or FEC."

It is, indeed, difficult to see just what the parties intended as the duration of the agreement. The fact is, they did not include in the agreement a term setting forth when and how the agreement might be terminated, but it is manifest that they contemplated a long-term arrangement.

The language cited by Southern Bell can be construed as evincing an intent to continue the contract indefinitely. In effect, Southern Bell is contending the use of such terms as "all cases which may hereafter arise" and "shall at any time hereafter desire" means that they are subject to an implied term such as "during the life of this indefinite contract."

On the other hand, these statements can be read as limited by a different implied statement such as "so long as the agreement is in effect."

█ For example, the statement in the agreement that "the railway company will * * * grant * * * the right * * * to construct telephone wires * * * whenever in the construction of telephone lines it becomes necessary * * *" would, under Southern Bell's interpretation, be followed by a clause such as "during the life of this indefinite contract." It seems equally plausible to qualify the contract language by the clause "so long as the agreement is in effect." Phrases such as "all cases which may hereafter arise," and "whenever it becomes necessary" do not compel the inference that the contract was to continue indefinitely. The other interpretation is as reasonable.

Since we are unable to find a clear intent to create a contract which would continue for an indefinite period, the case law becomes important.

Two related propositions are most important. First, that the construction of a contract conferring indefinite duration is to be avoided unless compelled by the unequivocal language of the contract. Second, a contract in which the parties express no period for its duration and no definite time can be implied from its nature or the surrounding circumstances can be terminated at will by either party upon giving of reasonable notice.

The first proposition is supported by the Freeport Sulphur case, supra.[4] This case, although decided by the Fifth Circuit, was a diversity action and involved the application of New York law. The Florida cases cited by the district court do not directly support the first proposition, but this may be unimportant as they do give support to the closely related second proposition.

In Florida-Georgia Chemical Co. v. National Laboratories, 153 So.2d 752 (Fla.App.1963), the plaintiff alleged that defendant orally granted it an exclusive sales agency in a defined area of the state. The plaintiff alleged that the arrangement continued for six years when, plaintiff said, defendant breached the agreement while it was still in effect. There was no termination date for the agreement. The trial court held that such contracts were terminable at will and no cause of action for breach could arise under such agreements. The appellate court said it accepted the proposition that *termination* of such a contract could not give rise to a cause of action, but here the question was whether the defendant had breached the agreement *while it was still in effect*, not whether the termination constituted a breach.

The appellate court then said that "The general rule as repeatedly stated, is that a contract for an indefinite period, which by its nature is not deemed to be perpetual, may be terminated at will on giving reasonable notice." (153 So. 2d at 754). However, the court said there is one exception in agency cases and that is that the agent's authority may not be summarily terminated where the agent has made expenditures in reliance upon the contract's continuation. Abrupt termination then gives rise to a suit to recover the agent's damages. This general rule and the exception were subsequently approved by the Florida Supreme Court in Sanchez v. Crandon Wholesale Drug Co., 173 So.2d 687 (Fla., 1965). This case (Fla.-Ga. Chemical) involved an exclusive sales agency and, therefore, is not wholly applicable to the case at hand, except to suggest that the general rule is that without a definite provision as to terminability, the Florida courts hold such agreements terminable at will.

Similarly, in Collins v. Pic-Town Water Wks., Inc., 166 So.2d 760 (Fla.App. 1964), also relied on by the trial court and the appellee, the plaintiff purchased lots from defendants as part of an agreement which included a promise of a reduced water rate of $1.50 per month when the lots were unoccupied. The agreement was silent as to its duration. After four and one-half years, the defendant gave notice that there would be a minimum of $3.50 a month whether the lots were occupied or not. The plaintiff sought specific performance of the original agreement. The court said that when the intended duration of a service contract cannot be determined, either party ordinarily can terminate it at will after giving reasonable notice. Therefore, as the contract to provide water at reduced rates stated no definite period of time and none could be im-

4. In this case Aetna Life Insurance Company agreed to issue pension plans for *all* employees of Freeport who joined the plan. It clearly contemplated a long term arrangement, because it provided for optional increases in premiums over five-year periods. The trial court found that 25 years was a reasonable term for the contract. This court modified the term to 20 years.

plied, the court said the only reasonable intention imputable to the parties is that the contract could be terminated upon the giving of reasonable notice.

The only Florida case which gives support to Southern Bell's position is City of Gainesville v. Board of Control, 81 So.2d 514 (Fla.1965), in which in 1905 the City and University of Florida officials entered into an agreement whereby the city would provide water to the university without charge. No termination date or cancellation procedures were provided. After fifty years, the city, hard pressed for funds, sought cancellation. The university said the city was obligated to provide water "in perpetuity." The Florida Supreme Court concluded that the issue for decision was whether the contract was one to last in perpetuity. It said that "the circumstances considered as a whole [do not] warrant the construction that the obligation was to exist perpetually * * *." (81 So.2d at 518). However, the court said that the contract did contemplate a free service so long as the University remained in Gainesville and, therefore, it enforced the agreement.

The district court in the present case distinguished the City of Gainesville case on the grounds that in it the Board of Control "had wholly executed the agreement on its part by permanently locating the University in Gainesville * * *"

Perhaps the general law (including Florida's) was best stated by the district court in Freeport Sulphur. 107 F.Supp. 508 (E.D.La., 1952). Judge Wright said that most cases presented in support of the "perpetual term" position involved cases where (1) the contract was fully performed on one side and the other was now seeking enforcement, or (2) the party seeking enforcement had suffered a severe detriment such as the outlay in large sums of money pursuant to the contract. (107 F.Supp. at 512). Both Florida cases in which a contract was held not terminable at will could fit into either of these exceptions. For example, in the City of Gainesville case, either the reliance or the partially executed exception could explain the result. Furthermore, the allowance of damages for the expenses incurred by the one relying on the executory sales agency agreement in *Florida-Georgia Chemical Co.*, supra, also can be viewed as fitting within the reliance exception.

Other cases relied on by Southern Bell where a contract was held to be not terminable at will even though it contained no express duration terms actually were not decided by reliance on the legal presumption of indefinite duration. Rather, the court viewing the agreement and the surrounding circumstances, concluded that the *actual intent* of the parties was to create a contract which would continue for an indefinite term.[5] Hence there was no need to resort to the legal presumption.

■ In summary, it appears that the intent of the parties as to the duration of the agreement cannot be determined with any certainty. It also appears that in general the common law allows such contracts to be terminated upon giving reasonable notice so long as one party has not relied to its detriment on the agreement or has fulfilled its part of the bargain without corresponding performance on the part of the other party. The few Florida cases on the subject show no indication that the Florida law is different. Southern Bell made no showing of detrimental reliance nor did it show that the other exception applied in this case. Therefore, FEC was within its rights in terminating the contract upon giving reasonable notice.

The judgment is affirmed.

CLAYTON, Circuit Judge, heard oral argument but on account of illness was unable to participate in the consideration or decision of this case.

5. See, for instance, Mississippi River Logging Co. v. Robson (8 Cir.) 69 F. 773; Western Union Telegraph Co. v. Pennsylvania Co., 3 Cir., 129 F. 849; McKell v. Chesapeake & Ohio Rwy. Co., 6 Cir., 175 F. 321.