TRIENT PARTNERS I LTD., Plaintiff–Counter–Defendant–Appellee,

v.

BLOCKBUSTER ENTERTAINMENT CORPORATION, et al., Defendants,

Viacom Inc., Successor By Merger to Blockbuster Entertainment Corporation, Defendant–Counter Claimant–Appellant,

and

Blockbuster Videos, Inc; Blockbuster Entertainment, Inc., Defendants–Appellants.

TRIENT PARTNERS I LTD., Plaintiff–Appellee,

v.

BLOCKBUSTER ENTERTAINMENT INC., Defendant–Appellant.

No. 95–21011.

United States Court of Appeals, Fifth Circuit.

May 10, 1996.

David L. Burgert, Warren Wayne Harris, Amy Marlyse Wilson, Porter & Hedges, Houston, TX, Paul A. Renne, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, CA, for Trient Partners I Ltd.

Bruce R. Coulombe, Dubois & Joseph, Montgomery, TX, for Blockbuster Entertainment Corp., Blockbuster Videos, Inc., Blockbuster Entertainment, Inc. and Viacom, Inc.

Before KING, WIENER and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

When this appeal is reduced to its bare essentials and stripped of all hyperbole, technical terminology, and obfuscatory theorizing, it presents a straightforward exercise in the interpretation of the provisions of two contracts: the "Agreement for System License" (the License Agreement); and a commercial store space lease—actually forty-three separate retail store space leases (the Leases). As the licensee of Defendant–Appellant Blockbuster,[1] Plaintiff–Appellee Trient Partners I Ltd. (Trient) opened and operated forty-three Blockbuster "Superstores" at locations within licensed areas in the states of Oregon and Washington. The instant facet of this diversity jurisdiction litigation implicates Trient's decision to go out of the video rental and sales business altogether; specifically, to abandon or "terminate" the License Agreement, return or reconvey proprietary personal property to Blockbuster, and—here's the rub—sell or assign the Leases to the highest bidder, whether that be Blockbuster or one or more third parties. Insisting that it has the right to acquire the Leases, Blockbuster has managed, through its litigating tactics, to delay Trient's disposition of the Leases for months. The litigation between Trient and Blockbuster has other aspects, but the issues surrounding the sale or assignment of the Leases are all that is before us today.

We conclude that under the instant circumstances (1) Trient cannot be prevented from unilaterally terminating the License Agreement, and (2) Blockbuster cannot force Trient to convey the Leases to Blockbuster following Trient's unilateral termination of the License Agreement. Consequently, we affirm the district court's summary judgment and lift all judicial constraints on alienation of the Leases. Our ruling leaves Trient free to dispose of the Leases as it sees fit, subject, of course, to the rights of its lessors thereunder, who were neither made parties hereto nor intervened herein, and whose rights are in no manner affected by our judgment.

## I.

### FACTS

In 1987 Blockbuster granted the License Agreement to Trient's predecessor, James M. Grisebaum. Covering several geographical areas in the country, the License Agreement authorized Grisebaum or his successor to develop and operate Blockbuster Superstores in those areas for the rental and sale of videotapes. After obtaining Blockbuster's consent as required in the License Agreement, Grisebaum transferred it to Trient, a Texas Limited Partnership, the General Partner of which is a Texas corporation. The License Agreement specified that all matters arising thereunder would be governed by Texas law, and neither the parties nor the courts have questioned the applicability of Texas law thereto.

Over the course of the ensuing eight years, Trient successfully opened and operated forty-three Blockbuster Superstores in its licensed areas in or around Portland, Oregon, and Seattle, Washington. By 1995 Trient's Superstores were generating middle-eight-figures gross income.

Trient and Blockbuster first tangled judicially in 1994, after Blockbuster opened proprietary music stores in close proximity to a number of Trient's Superstore locations. Trient took umbrage with this move by Blockbuster largely because, in addition to audio disks and cassettes, the music stores sold blank and recorded videotapes, laser disks and video games. Contending that Blockbuster had violated non-competition provisions in the License Agreement, Trient sued Blockbuster in district court. In response, Blockbuster voluntarily ceased selling recorded videotapes from its music stores but continued to sell video games, video laser disks, and blank videotapes. Aspects of that litigation are ongoing.

Following these negative developments in the relationship between Trient and Block-

---

**1.** Blockbuster Entertainment Corporation, parent corporation of Blockbuster Videos, Inc., merged with Viacom, Inc., which is now successor by merger to Blockbuster Entertainment Corporation. For the sake of simplicity, these parties will be referred to in the opinion simply as Blockbuster.

buster, Trient decided in 1995 to exit the video rental and retail sales market altogether. The record contains no evidence that Trient was or is in default under either the License Agreement or the Leases, now or at any other times pertinent to this appeal.

Apparently aware of provisions in the License Agreement that prohibit the transfer of the going business and the alienation of specified proprietary materials, computer programs, and the like without Blockbuster's consent, Trient nevertheless prepared to liquidate its *unrestricted* assets—among which it included the Leases—on the open market. In furtherance of this effort, Trient hired an investment banking firm to put together an offering or bid package and shop the package among potential purchasers. After Blockbuster received a copy of that package, it advised Trient that its Superstores could not be alienated without Blockbuster's consent, and that any attempt by Trient to transfer those stores would be met with opposition from Blockbuster. In response, Trient called to Blockbuster's attention the fact that the proposed disposition of assets would expressly exclude Trient's rights under the License Agreement, as well as the Superstores as operating businesses.

Again, the only assets of concern to us today are the forty-three Leases. On the one hand, Trient insists that it can terminate the License Agreement and thereafter dispose of all nonproprietary assets, including the Leases, to anyone it chooses, whether that be Blockbuster, competitors of Blockbuster, or non-competitive third parties. On the other hand, Blockbuster insists that some of the provisions of the License Agreement, as well as an express provision found in twenty-three of the forty-three Leases, prohibit Trient from selling or assigning the Leases on the open market and give Blockbuster the right to acquire them.[2]

## II.

### PROCEEDINGS

Trient filed this declaratory judgment action against Blockbuster in federal district court in Texas, seeking judicial recognition of Trient's right to (1) terminate the License Agreement unilaterally, even in the absence of a default by Blockbuster or other cause, and (2) proceed thereafter with its plan to sell its assets, principally the Leases. The case comes to us from a unique procedural history in the district court. The court signed an Order on November 30, 1995, allowing "the sale of Trient's assets clear from obligations to Blockbuster" to proceed as scheduled, with bids due to be received on December 8, 1995. On December 4, 1995, Blockbuster filed (1) a notice of appeal in that case, to which appeal this court assigned No. 95–21011; and (2) an emergency petition for a writ of mandamus, to which we assigned No. 95–21008. We denied the mandamus on December 13, 1995, but held other motions in abeyance so that Blockbuster could promptly file a motion in the district court for severance, and the district court could act expeditiously on such motion. The day after we took that action, Blockbuster filed a joint motion for severance in which it requested a ruling from the district court by or before December 20, 1995. The motion for severance included Blockbuster's motion for reconsideration based on newly discovered evidence.

Trient's bid deadline had been moved to January 5, 1996, so—after conducting a hearing on December 20, 1995—the district court, on the afternoon of January 4, 1996, rendered its opinion on limited remand and its order of severance. In response, Blockbuster amended its notice of appeal to include this ruling of January 4th. Blockbuster followed that with a motion asking this court for a stay pending appeal, and Trient filed a motion seeking expedited appeal. We granted both motions, and heard oral argument on March 5, 1996.

## III.

### ANALYSIS

#### A. APPELLATE JURISDICTION

Although Blockbuster and Trient agree that the district court's rulings of No-

---

**2.** Blockbuster conceded in oral argument to this court that the License Agreement contains no express provision that vests Blockbuster with the right to acquire the Leases upon the termination of the Agreement.

vember 30, 1995, and January 4, 1996, are final and thus appealable under 28 U.S.C. § 1291, appellate jurisdiction is not a matter of consent; we must examine the issue of jurisdiction on our own motion.[3] As the district court severed the issue regarding whether Blockbuster has the legal right to force Trient to assign the Leases to Blockbuster, this "appeal is not from a final judgment in the traditional sense under 28 U.S.C. § 1291."[4] Nevertheless, we may take jurisdiction of a collateral matter if it is "severable from the underlying suit, and too important to be denied review at this time."[5] As that is the situation here, we have jurisdiction to hear this expedited appeal.

### B. STANDARD OF REVIEW

■ The aspect of this case that was severed by the district court was determined on summary judgment, which we will affirm only when we are "convinced, after an independent review of the record, that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[6] Fact questions must be considered with deference to the non-movant; questions of law are reviewed de novo.[7]

■ Our de novo review of legal questions includes the interpretation of contracts.[8] In its brief to this court, Blockbuster complains that the district court "found" facts that were neither relevant to the issues presented—which Blockbuster identifies as "two straightforward questions of contract interpretation"—nor supported by the evidence. Blockbuster declares that the "only facts necessary to resolve these legal questions are

the plain language of the relevant sections of the [License Agreement and the Leases]."

We agree in general with Blockbuster's analytical framing of the issues presented in this appeal. Two straightforward questions of a purely legal nature are at the heart of the dispute: (1) Can Trient unilaterally terminate the License Agreement without cause?; and (2) if we answer that question in the affirmative, do the assignment provisions in the Leases between Trient as lessee and the property owners as lessors nevertheless create an obligation of Trient to sell, assign, or otherwise transfer those Leases to Blockbuster upon the termination of the License Agreement at a time when Trient is not in default? These two purely legal questions of contract interpretation are reviewed de novo.[9]

### C. THE MERITS

#### 1. *Terminating the License Agreement*

##### a. *Indefinite in Duration*

■ We examine first the question whether Trient can unilaterally terminate the License Agreement absent breach or default by Blockbuster. The resolution of this issue depends in large measure on whether the License Agreement is "indefinite in duration."[10] Under Texas law, when a contract "contemplate[s] continuing performance (or successive performances) and ... [is] indefinite in duration," it may be terminated at the will of either party.[11] Moreover, "this circuit ... does not favor perpetual contracts"[12] and "presumes that [any such] contract is terminable at will."[13]

---

**3.** *See Matter of Watson,* 884 F.2d 879, 879–80 (5th Cir.1989).

**4.** *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.,* 559 F.2d 250, 251 (5th Cir.1977).

**5.** *See id.*

**6.** *Herrera v. Millsap,* 862 F.2d 1157, 1159 (5th Cir.1989) (internal quotations omitted).

**7.** *See id.*

**8.** *See D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.,* 957 F.2d 196, 199 (5th·Cir. 1992).

**9.** *See D.E.W., Inc.,* 957 F.2d at 199.

**10.** *See Clear Lake City Water Auth. v. Clear Lake Util. Co.,* 549 S.W.2d 385 (Tex.1977) (citations omitted).

**11.** *See id.*

**12.** *See Delta Serv. & Equip., Inc. v. Ryko Mfg. Co.,* 908 F.2d 7, 9 (5th Cir.1990).

**13.** *See id.*

In the instant case, the License Agreement specifies that it is intended to "continue indefinitely ... until terminated in accordance with the provisions hereof." The referenced provisions expressly allow for the termination of the License Agreement upon (1) defaults by either party that are not or cannot be cured within a specified number of days; (2) the death or incapacity of a natural person who is one of Trient's partners, if Blockbuster does not consent to the transfer of the deceased partner's interest; (3) the transfer or change of control of Trient's partnership without Blockbuster's prior approval; and (4) the insolvency of either party.

■ We hold that the conditions provided for in the "termination provisions" of the License Agreement are not the kind of determinable events that transform a contract of indefinite duration into one of definite duration. With regard to the first condition, the License Agreement merely provides that it will "continue indefinitely" *until*—meaning "unless"—it is breached by means of an incurable or uncured default. Under foundational principles of contract law, the term of any contract is terminable by one party upon a total or material breach by another party. Accordingly, an agreement which is otherwise indefinite in duration and terminable at will cannot be converted into an agreement of definite duration by the mere transcription of such universals within the text of the contract.[14]

Moreover, taken as a whole, the conditions contained in the License Agreement's "termination provisions" do not limit the duration of the License Agreement or make its duration determinable in any real or concrete way. We will not hold that a contract is definite in duration when it (1) expressly states that it will "continue indefinitely," *and* (2) is confined in time only by "termination provisions" which contain conditions that are likely never to transpire.[15] If we were thus to hold, Trient could very well be forced by Blockbuster to stay in the video rental and sales business, and operate Superstores, in perpetuity. This is precisely the antithetical result that courts seek to avoid by holding indefinite duration contracts to be terminable at will.[16]

### b. The Impact of Big Spring

Not to be dissuaded easily, Blockbuster insists that the Texas Supreme Court's opinion in *City of Big Spring v. Bd. of Control*[17] mandates the conclusion that the License Agreement is definite in duration and therefore not terminable at will. We disagree.

In *Big Spring*, the City of Big Spring, Texas, already the provider of water to its own inhabitants, agreed—as an inducement

14. *Cf. Delta Serv.*, 908 F.2d at 8–9 (discussing provision in contract specifying that "[e]ither party may terminate this agreement ... in the event of either party defaulting in the performance of any of the terms or conditions of the contract") (holding that such a provision did not prevent contract of otherwise indefinite duration from being terminable at will, as the provision "would have been implied if not stated in the contract") (applying Iowa law, which provides that contracts "are terminable at will upon reasonable notice unless a provision in the contract makes it a contract of definite duration").

15. *Cf. id.* at 12 (holding that "the termination clause permitting [one party] to immediately terminate the contract if [the other party] did not meet its sales quota" did not prevent contract of otherwise indefinite duration from being terminable at will); *Moore v. Sec. Trust & Life Ins.*, 168 F. 496, 500 (8th Cir.1909) ("The implication invoked that the contract was not terminable at will, because it contained clauses, unnecessary if it was so terminable, specifying causes for its termination, is too feeble to withstand the compelling force of the presumption that the plain-

tiffs could not have intended to surrender control of their own business and service for life...."), *cert. denied*, 219 U.S. 583, 31 S.Ct. 469, 55 L.Ed. 346 (1910).

Blockbuster notes that in *Univ. Computing Co. v. Leader Corp.*, 371 F.Supp. 86 (N.D.Tex.1974), a federal district court held that a contract that expressly provided a license to the defendant "for an indefinite period of time" was not terminable at will. In that case, however, the district court based its decision on the fact that the contract set forth concrete periods of time—measured by a specific number of days, months, and years—governing the obligations of the party who sought termination. *Id.* By contrast, under the terms the License Agreement, Trient's obligations could continue in perpetuity.

16. *See* Richard A. Lord, *Williston on Contracts* § 4:19, at 432–33 (4th ed. 1990).

17. 404 S.W.2d 810 (Tex.1966) [hereinafter *Big Spring*].

to locate the hospital there—to provide water to the hospital which was to be run by the State of Texas Board of Control "for as long as the State of Texas shall in good faith maintain and operate said hospital on said site." [18] The *Big Spring* court addressed as a concededly "collateral poin[t]" [19] the issue whether the contract between the City and the Board of Control was indefinite in duration. Noting that indefinite duration contracts are terminable at will, the court held that the contract had a definite term and could not be terminated by the City. [20]

Recognizing the dangers of making an "Erie guess," we nonetheless conclude that the *Big Spring* opinion does not control the outcome of the instant case. The *Big Spring* court was faced with the question whether one governmental body (the City) should be required to perform a quintessential public service (the furnishing of water) for another governmental body (the State), which was operating a paradigmatically public institution (the hospital). We are here faced with an entirely different and distinguishable set of circumstances. It is one thing to require a municipality, which is already charged with providing water to its citizens for an indefinite period of time, to furnish water to a state-operated hospital as well for an uncertain period of time, particularly when the City's promise to supply water was an inducement for the State to build the hospital there in the first place. [21] It is quite a different thing to bind a franchised commercial business to operate in perpetuity. [22] All in all, given the principal public-law focus of *Big Spring*, together with the dissimilarities between the contractual language involved in that case and the "termination provisions" of the License Agreement, we reject Blockbus-

ter's argument that the *Big Spring* decision controls the outcome of the instant case.

This conclusion is supported by our decision in *Southern Telephone & Telegraph Co. v. Florida East Coast Ry. Co.*, [23] in which we interpreted a contract governed by Florida law. Much like Texas law, Florida law provides that "a contract in which the parties express no period for its duration ... can be terminated at will be either party upon giving of reasonable notice." [24] The contract in question contained no provision regarding "when, how, or even if, it [could] be terminated." [25]

One of the parties, Southern Bell, nevertheless argued that the contract was not terminable at will. In so arguing, Southern Bell relied heavily on a Florida Supreme Court case that is closely analogous to the Texas Supreme Court's decision in *Big Spring*. Our discussion of the Florida case makes evident its similarities to *Big Spring*:

> The only Florida case which gives support to Southern Bell's position is *City of Gainesville v. Board of Control*, [81 So.2d 514] [ (Fla.1955) ], in which in 1905 the City and University of Florida officials entered into an agreement whereby the city would provide water to the university without charge. No termination date or cancellation procedures were provided. After fifty years, the city, hard pressed for funds, sought cancellation.... The Florida Supreme Court concluded that the issue for decision was whether the contract was one to last in perpetuity.... [T]he court said that the contract ... contemplate[d] a free service *so long as the University remained in Gainesville* [rather than perpetually] and, therefore, it enforced the

---

**18.** *See id.* at 811.

**19.** *See id.*

**20.** *See id.* at 815.

**21.** *See id.*

**22.** Blockbuster notes that *Big Spring* is cited in a recent Fifth Circuit decision. *See Hiller v. Mfr. Prod. Research Group of N. Am.*, 59 F.3d 1514, 1529 (5th Cir.1995) (dissenting opinion). In that

opinion, *Big Spring* is cited only by the dissenting judge, and then only to support the broad conclusion that an indefinite duration contract could be terminated by the parties at the end of a reasonable time. *See id.* Accordingly, this citation of *Big Spring* is inapposite to our analysis.

**23.** 399 F.2d 854 (5th Cir.1968).

**24.** *Id.* at 858.

**25.** *Id.* at 855.

agreement.[26]

Rejecting Southern Bell's argument that *City of Gainesville* controlled the outcome of its contract dispute, we held that (1) *City of Gainesville* simply provided an exception to the general rule of law governing indefinite duration contracts in Florida, and (2) this exception did not apply to Southern Bell's contract.[27]

Similarly, we hold in the instant case that (1) *Big Spring* simply carves out an exception to the general rule of law governing indefinite duration contracts in Texas, and (2) this exception does not apply to the contract between Blockbuster and Trient.

### c. *Reasonable Duration*

■ Blockbuster argues alternatively that even if the contract is indefinite in duration, we should imply a term of "reasonable duration" to give Blockbuster the opportunity to develop "its own 43–store network" in Seattle and Portland. The Texas Supreme Court has recognized that courts often imply a term of reasonable duration during which franchise agreements that "contemplate the expenditure of substantial sums of money ... by one of the parties" will not be terminable at will.[28]

In the instant case, however, the record establishes that Trient, and not Blockbuster, has expended "substantial sums of money" in connection with the License Agreement. Moreover, Trient and Blockbuster bound themselves by the terms and conditions of the License Agreement more than eight

years before Trient decided to terminate it in connection with existing the videotape rental and sales business. Accordingly, we need not engage in an exercise to ascertain just what would be a "term of reasonable duration" for this particular License Agreement; we are satisfied that whatever such a duration might be, it has long since been met and passed. We note in passing that it took Trient years to build its 43–store network, and it would be a commercial absurdity to force Trient to keep operating for additional years during which Blockbuster would attempt to replicate that feat—all the time creating competition for Trient at its leased locations.

### 2. *The Assumption of the Leases*

### a. *Provisions of the License Agreement*

Having determined that Trient may, under the instant facts, unilaterally terminate the License Agreement, we must next consider whether, once it does so, Blockbuster would nevertheless have the right to acquire the Leases, which are bilateral contracts between Trient as lessee and the third-party property owners as lessors. In this regard we note first that in the License Agreement itself the parties expressly enumerated their respective rights upon its termination "for any reason." Yet this extensive list does *not* include the right of Blockbuster to acquire Trient's Leases; and the language of the License Agreement nowhere suggests that the list is intended to be merely illustrative or non-exclusive.[29] Similarly, the License Agree-

---

**26.** *Id.* at 859 (citations omitted) (emphasis added).

**27.** *Id.*

**28.** *See Clear Lake*, 549 S.W.2d at 391 ("[I]n dealing with exclusive franchise ... agreements, which are indefinite in duration and which contemplate the expenditure of substantial sums of money ... by one of the parties ..., the courts often imply a term of reasonable duration during which the agreement is not terminable at will.").

**29.** Section 7.2 of the License Agreement provides:
(a) Upon termination of this Agreement for any reason, [Trient] shall immediately pay Blockbuster any and all royalties, advertising contributions, or other amounts due to Blockbuster on the date of such termination.

(b) Upon termination of this Agreement for any reason, [Trient] shall immediately (i) cease all use of the Trade Names, the Service Marks, and any other trade names or service marks that might reasonably be construed to indicate that it has any relationship with Blockbuster, its trade names, or service marks, (ii) cease all use of the proprietary systems, procedures, methods and specifications for the management and operation of video tape rental and sales business ..., (iii) cease all use of the Licensed Programs, (iv) allow Blockbuster employees or agents to deinstall each Licensed Program from its Designated Equipment, and (v) return to Blockbuster all other copies of the Licensed Programs ... and any other items provided by Blockbuster.

(c) Upon any termination of this Agreement by Blockbuster for cause, any damages suffered

ment specifies by section number those among its provisions that will survive the termination of the License Agreement; and nothing suggests that this list is illustrative or non-exclusive either. Among the License Agreement's provisions that are listed as surviving termination, none can be read to give Blockbuster the right, vis á vis Trient, to acquire the Leases. Even Blockbuster concedes that the License Agreement—the one and only contract that directly sets forth the respective rights and obligations of Trient and Blockbuster in their dealings with one another—does *not* contain any provision that expressly obligates Trient to transfer the Leases to Blockbuster following Trient's termination of the License Agreement at a time when Trient is not in default under either the License Agreement or the Leases.

### b. *The Leases*

#### (1) *The Assignment Provisions*

■ Regardless of the absence of any such provision in the License Agreement, however, Blockbuster nevertheless insists that provisions of the *Leases* —to which it concedes that it is not a party—give Blockbuster the right to acquire Trient's leasehold interests in the former Superstore sites. Blockbuster argues that assignment provisions which are found in twenty-three of the forty-three Leases—and which Trient was obliged to expend its best efforts to obtain in all of them—obligate Trient to transfer its leasehold interests to Blockbuster upon the termination of the License Agreement. Those assignment provisions read:

> Without Landlord's consent, Tenant may assign the Lease to Blockbuster ... at any time during the Lease Term or any renewal thereof, and upon the termination or expiration of the Agreement for System License between Blockbuster and Tenant

("the Agreement") Blockbuster may, at its sole option and without the consent of the Landlord, assume all of the obligations and liabilities of Tenant for the balance of the term of the Lease.... [30]

We decline Blockbuster's invitation to hold that these assignment provisions divest Trient of the right to assign its Leases as it wills when the License Agreement is terminated by Trient at a time when neither Blockbuster nor Trient is in default. The provisions in question can only be read to constitute the lessors' *pre* clearance of Blockbuster as a potential assignee and permit Blockbuster to step into Trient's shoes as substitute or successor lessee rather than have the Leases terminate—not unlike an attornment clause in a mortgage. When each assignment provision is viewed in the context of the entire lease agreement—a contract between landlord and tenant—and the lease is read in its entirety, the manifest purpose of the provision clearly is to *not* to bind Trient to transfer the Leases to Blockbuster, but rather to bind the lessors to accept Blockbuster as an assignee or successor tenant *if* (1) Trient should choose to assign the lease to Blockbuster, or (2) Blockbuster should choose to take over Trient's lease at a time when the lessor could terminate the lease due to a default by Trient as lessee.[31]

The assignment provisions of the Leases obligate the *lessors* to permit the Leases to be assumed by Blockbuster, given an assignment from Trient. These provisions could not, as a matter of contractual law, obligate a lessor to assign his or her lessee's leasehold interest; every lessor is powerless to do that.

#### (2) *Third Party Beneficiary Status*

■ Even assuming *arguendo* that there were some ambiguity whether the as-

---

by Blockbuster for non-payment of amounts due Blockbuster under this Agreement shall be in a lien in favor of Blockbuster against the personal property, inventory ... and other equipment owned by [Trient] at the Superstores....

**30.** Some of the Leases include assignment provisions that vary slightly from this language. The variations are inconsequential to our analysis of this issue.

**31.** As earlier noted, twenty of the Leases do not include an assignment provision. Nevertheless, Blockbuster argues that it has the right to assume those leasehold interests as well, for the reason that the License Agreement requires Trient to use its "best efforts" to ensure that the Leases include assignment provisions. As we hold that the assignment provisions do not confer on Blockbuster the unilateral right to acquire the Leases from Trient, this argument is moot.

signment provisions are merely the lessors' prior approvals of Blockbuster as a successor to Trient as lessee or—as contended by Blockbuster—these provisions somehow give Blockbuster the right, as a non-party, to assume the Leases, Blockbuster could prevail against Trient only if it could demonstrate that Blockbuster was intended to be a third party beneficiary of the Leases. It has failed to do so. A third party beneficiary contract is only created if (1) the intent of the parties to the contract is clear that the promisor is assuming a direct obligation to the beneficiary; and (2) such intent is evidenced at the time that the contract is formed.[32] In this instance, the "promisor" to whom Blockbuster must look is Trient, and not the lessor.

In arguing that the assignment provisions impose an obligation on Trient to assign the Leases to Blockbuster upon termination of the License Agreement, Blockbuster insists that the language of the assignment provisions, together with particular clauses of the License Agreement, unambiguously establish that Trient and the lessors intended to impose such an obligation on Trient. We disagree. First, even when viewed in the light most favorable to Blockbuster, there is at best some ambiguity as to whether the assignment provisions give Blockbuster a right to acquire the Leases from Trient upon the termination of the License Agreement. Such ambiguity is insufficient as a matter of law to establish that, at the inception of the several Leases, either Trient or the lessors, or both, clearly intended to impose an obligation on Trient to transfer the Leases to Blockbuster upon termination of the License Agreement.

Moreover, as discussed earlier, the provisions of the License Agreement do *not* sup-

port the conclusion that Trient intended to ensure that the Leases would confer on Blockbuster the right to acquire the leasehold interests from Trient upon termination of the Agreement. On the contrary, the License Agreement details at great length the duties that Trient agreed to undertake, or to continue to undertake, vis á vis Blockbuster following the termination of the License Agreement, and none of those duties include the obligation to transfer the leasehold interests in its store sites to Blockbuster. Thus, far from evidencing that Trient intended the assignment 'provisions in the Leases to confer on Blockbuster the right automatically to assume the Leases upon termination of the License Agreement, the absence of such an obligation in the provisions of the License Agreement actually supports the conclusion that Trient did *not* so intend.

In sum, the plain language of the assignment provisions of the Leases creates no third party beneficiary obligations running from Trient to Blockbuster. If any such obligations are created in the Leases, they run only from the lessors to Blockbuster, and then only passively, i.e., the obligation not to object to assignments of the lessee's interests to Blockbuster—assignments that the lessors are clearly unable to effectuate.

Accordingly, Blockbuster is not a third party beneficiary of the Leases, at least as far as an assignment obligation of Trient is concerned. As a result, Blockbuster cannot enforce the assignment provisions against Trient; and any enforceability against the lessors of their obligation to permit Blockbuster to succeed Trient as lessee would be

---

**32.** Trient and Blockbuster disagree whether Texas, Washington, or Oregon law should be applied to this issue. We need not resolve this dispute, as under the law of each of the three states, a third party to a contract may not enforce the provisions of that contract unless it is clear ab initio that the parties to the contract intended to impose a direct obligation with respect to the third party. *See Sisters of St. Joseph of Peace, Health, & Hosp. Serv. v. Russell,* 318 Or. 370, 867 P.2d 1377 (1994) (holding that "a third party's right to enforce a contractual promise in its favor depends on the intention of the parties to the

contract"); *Burke & Thomas, Inc. v. Int'l Org. of Masters, Mates, & Pilots,* 92 Wash.2d 762, 600 P.2d 1282 (1979) (en banc) ("The creation of a third party beneficiary contract requires that the parties intend that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract."); *Corpus Christi Bank & Trust v. Smith,* 525 S.W.2d 501, 503–04 (Tex.1975) ("[W]e must begin with the presumption that parties contract for themselves, and a contract will not be construed as having been made for the benefit of third parties unless it clearly appears that such was the intention of the contracting parties.").

714

meaningless without assignments of the leasehold interests from Trient.[33]

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor if Trient and lift all judicial restraints on alienation of the Leases. As Trient's lessors are not parties to this litigation, nothing herein contained is intended to affect their rights or to impose obligations on them. In light of the delays suffered by Trient as a result of this litigation, we order the mandate to issue forthwith.

AFFIRMED, MANDATE TO ISSUE IN-STANTER.

---

**33.** Had the License Agreement been terminated by Blockbuster for one of the causes specified therein, the results of this analysis might have been different; but that case clearly is not before us today.