**SENSORMATIC SECURITY CORPORATION**

v.

**SENSORMATIC ELECTRONICS CORPORATION, et al.**

Civil Action No. DKC 2002–1565.

United States District Court,
D. Maryland.

March 28, 2003.

David J. Butler, Martin L. Zerwitz, Tracie H. Yoon, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Terence J. Lynam, Akin Gump Strauss Hauer and Feld, LLP, Washington, DC, for Sensormatic Security Corporation.

Stefan Alexander Hagerup, Terence J. Lynam, Akin Gump Strauss Hauer and Feld, Washington, DC, Anthony T. Pierce, Washington, DC, for Tyco International Ltd.

Terence J. Kyman, Akin Gump Strauss Hauer and Feld, Washington, DC, for Sensormatic Electronics Corporation.

Sean F. Murphy, John S. Jenkins, Jr., Nancy L. Werner, Stanley F. Wruble, III, McGuire Woods, LLP, McLean, VA, for Wallace Computer Services, Inc.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending in this franchise-related action are several motions to dismiss and cross motions for summary judgment. The issues are fully briefed, and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.

## I.  Background

In the Second Amended Complaint, Sensormatic Security Corporation (SSC) brings claims against Sensormatic Electronics Corporation (Sensormatic), ADT Security Services, Inc. (ADT) and Wallace Computer Services (Wallace) for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and tortious interference with contract. Sensormatic filed a counterclaim for declaratory judgment and unjust enrichment.

Plaintiff SSC, a franchisee of Sensormatic, claims an exclusive right to lease, sell, distribute, service, repair and maintain Sensormatic security and anti-theft equipment in Maryland, the District of Columbia, and Virginia. Sensormatic was acquired by Tyco International Ltd. (Tyco) in November 2001 and is now a wholly-owned subsidiary of Tyco and is part of the Tyco Safety Products group, within Tyco's Fire and Security Services business unit. ADT is also a wholly-owned subsidiary of Tyco, within the Fire and Security Services business unit.

SSC has been a franchisee of Sensormatic since 1967. The Restated Franchise Agreement dated December 1, 1976, granting an exclusive franchise in Virginia, is attached as Exhibit 1 to the Second Amended Complaint. Exhibit 2 is a Restated Franchise Agreement dated December 1, 1976, between Sensormatic of Washington, Inc., a former affiliate of SSC, and Sensormatic, granting Sensormatic of Washington, Inc. an exclusive franchise territory in Maryland and the District of Columbia. In 1978, Sensormatic of Washington, Inc. merged into Sensormatic. Thus, Sensormatic claims the exclusive franchise in Maryland, Virginia, and the District of Columbia.

SSC asserts that the Franchise Agreement grants it an exclusive franchise to lease, sell and/or otherwise distribute, and service, repair, and maintain Sensormatic's equipment and to use Sensormatic trademarks in connection with those activities. Section 9(c) of the Agreement prohibits the franchisor from competing with SSC in selling or leasing equipment in Plaintiff's territory and from granting "to any third party a franchise or any other right to sell, lease or service Equipment in [SSC's] territory."

The term "Equipment" is defined in the Franchise Agreement as "All Detection Devices, Tags, Accessories and Supplies." The term "Detection Devices", in turn, is defined as "the detection systems and devices presently being marketed by the Franchisor for Automatic Theft Detection Uses ... which include a transmitter and coordinated receiver and alarm console, and which may be installed and used as a system or device to activate and detect Tags, sounding an alarm or otherwise activating a control device, and all successors thereto." "Tags" are alleged to include "tags, labels, sensors, transponders and sensoremitters and the like, marketed by the Franchisor for Automatic Theft Detection Uses." SSC also claims entitlement to a commission of 40% of the gross revenues received by Sensormatic from the lease or sale of Detection Devices and Tags, and the right to install, service and repair and maintain the equipment in SSC's territory

According to the complaint, the only exception to SSC's exclusive right is Sensormatic's right to sell and lease equipment to National Accounts and to enter into service or maintenance contracts with National Account Customers regarding that equipment. A National Account is "any customer ... of the Franchisor or the Franchisee who or which has leased or

purchased or may lease or purchase products for use in more than one state."

A settlement agreement on December 7, 1984 amended certain provisions and is attached to the Second Amended Complaint as Exhibit 3. Paragraph one of the agreement states, in part:

> The Company agrees that the Company's Sensorgate System, and the present and future electro-magnetic product lines of the Company, of which the SensorGate System is a part, shall be included within the franchise under the Franchise Agreement between the Company and the Franchisee for Automatic Theft Detection Uses (as defined in the Franchise Agreement), and in that connection shall be included within the meaning of Detection Devices, Tags, Accessories, Supplies and Equipment (as defined in the Franchise Agreement), as the case may be.

Paragraph two reads, in part:

> The Company agrees that the Company's SensorVision (CCTV) System, and the Company's present and future CCTV product lines of which the SensorVision System is a part, shall be included within the franchise under the Franchise Agreement, for Automatic Theft Detection Uses (as defined in the Franchise Agreement), as well as for surveillance in other common areas of customers for the Company's Equipment for Automatic Theft Detection Uses, and in that connection shall be included within the meaning of Detection Devices, Accessories, Supplies and Equipment (as defined in the Franchise Agreement), as the case may be.

A Letter of Understanding dated December 7, 1984 is exhibit 4. With regard to National Sales, the letter states:

> Sensormatic agrees that the Franchisee will be informed of sales calls to be made by Sensormatic representatives to

accounts (including national accounts) in the the [sic] Franchisee's territory. The Franchisee's representative will be invited to go along on the sales call, unless the customer objects; if so, then on a best efforts basis, Sensormatic will try to persuade the customer to allow the attendance of the Franchisee's representative on the sales call. If, at the customer's insistence, a specific individual representing the Franchisee is not allowed to attend, if feasible, Sensormatic will attempt to persuade the customer to allow a different representative from the Franchisee to attend the sales call. If for any reason a sales call is made by Sensormatic in the Franchisee territory without a representative of the Franchisee in attendance, Sensormatic will promptly report the substance and results of such sales call to the Franchisee.

On February 11, 1997, Wallace entered into a licensing agreement with Sensormatic by which Wallace has the right to use Sensormatic trademarks to manufacture and sell Ultra–Max labels. SSC asserts that the Ultra–Max labels are "tags" as defined in its franchise agreements.

The complaint goes on to allege that Sensormatic used Intelligent Marketing as its manufacturer's representative in the mid-Atlantic territory for several years and, through that company, has authorized between 20 and 40 distributors and dealers to sell and service Sensormatic Equipment to customers within SSC's exclusive territory.

On November 13, 2001, Tyco acquired Sensormatic. Sensormatic was merged into Tyco Acquisition Corp (TAC), a wholly-owned subsidiary of Tyco. TAC then changed its name to Sensormatic Electronics Corporation. Tyco has divided the company's operations among other Tyco entities. Sensormatic sells equipment to ADT, which then sells and leases equip-

ment through its sales force, including to customers allegedly in Plaintiff's territory.

The Second Amended Complaint contains seven counts: Count I alleges breach of contract by Sensormatic by authorizing third parties to sell and service within SSC's territory; Count II alleges breach of contract against Sensormatic for failure to pay commissions; Count III alleges breach of contract against Sensormatic for failure to provide documentation; Count IV is a breach of contract claim and breach of covenant of good faith and fair dealing against Sensormatic regarding replacement parts; Count V is a claim for unjust enrichment against ADT; Count VI is a claim for tortious interference with contract against Wallace based on its contract with Sensormatic; and Count VII is a claim for tortious interference with contract against ADT due to its relationship with Sensormatic.

In Count I of its counterclaim, Sensormatic seeks a declaratory judgment that it has the right under the Franchise Agreement to terminate the Franchise Agreement on reasonable notice and that its letter of August 22, 2002, providing a minimum of six months notice constitutes reasonable notice. Count II is a claim for unjust enrichment asserting that it inadvertently paid commissions to SSC for CCTV products that are not sold for Automatic Theft Detection Uses.

## II. Motions to Dismiss

### A. Standard of Review

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All that the Federal Rules of Civil Procedure require of a complaint is that it con-

tain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 47, 78 S.Ct. 99; *Comet Enters. Ltd. v. Air–A–Plane Corp.,* 128 F.3d 855, 860 (4th Cir.1997). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002), *quoting Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In reviewing the complaint, the court accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969). The court need not, however, accept unsupported legal conclusions, *Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979).

### B. Analysis

*1. ADT's motion to dismiss count V for unjust enrichment.*

ADT moves to dismiss count V, asserting that SSC has not—and cannot—allege sufficiently that SSC conferred a benefit on ADT.

a. Choice of Law.

As a federal court exercising diversity jurisdiction, the court looks to Maryland law to determine which state law governs the dispute. Unfortunately, the parties do not even agree as to what test Maryland courts would use to determine what law applies.

The Supreme Court in *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), relying upon *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), determined that, in a diversity action in federal district court, the court is to apply the conflicts law of the forum state. The parties disagree as to whether Maryland has conclusively decided the test to be applied in an unjust enrichment case. Based on Restatement (Second) of Conflict of Laws § 221 (1971), some courts have applied the five factor test to determine which state "has the most significant relationship to the occurrence and the parties." As stated in *Motor City Bagels, LLC v. The American Bagel Company,* 50 F.Supp.2d 460, 477 (D.Md.1999):

> The restatement outlines the factors that should be taken into account in making this determination:
>
> (a) the place where the relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
>
> (b) the place where the benefit or enrichment was received,
>
> (c) the place where the act conferring the benefit or enrichment was done,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (e) the place where a physical thing, such as land or chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

On the other hand, a fairly recent decision of the Court of Special Appeals of Maryland appears to employ *lex loci contractus* to determine which law applies to an unjust enrichment claim. In *Konover Property Trust, Inc. v. WHE Associates, Inc.*, 142 Md.App. 476, 489–90, 790 A.2d 720, 728 (2002), the court applied the rule of *lex loci contractus* to claims of unjust enrichment and *quantum meruit*, but did so without discussion or elaboration.

ADT contends that Florida, rather than Maryland, law should apply regardless of which framework is used, but that a decision on choice of law is unnecessary because the elements of the claim are identical in both jurisdictions. SSC disagrees, and contends that Maryland law should apply, under which a particular interpretation of the "benefit conferred" element allows its claim to proceed. Because the court concludes that SSC cannot state a valid claim for unjust enrichment under Maryland law, which it claims is more favorable to its position than is Florida law, it will not be necessary to decide which choice of law test or which state's substantive law to apply to this claim.

b. Benefit Conferred by Plaintiff.

■ The Court of Appeals of Maryland has defined unjust enrichment as constituting three elements:

" '1. A benefit conferred upon the defendant by the plaintiff;

" '2. An appreciation or knowledge by the defendant of the benefit; and

" '3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.' "
County Comm'rs v. J. Roland Dashiell & Sons, Inc., 358 Md. 83, 95 n. 7, 747 A.2d 600, 607 n. 7 (2000) (quoting *Everhart v. Miles*, 47 Md.App. 131, 136, 422 A.2d 28, 31 (1980)).
*Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151, 757 A.2d 108, 113 (2000).

The first element of an unjust enrichment claim is that a benefit be conferred upon the defendant by the plaintiff. Plaintiff contends that, "when the alleged benefit is the defendant's improper acquisition and retention of money that rightfully belongs to the plaintiff, Maryland law does not require that the plaintiff establish that it was the party that actually provided defendant with those funds." Paper no. 39, at 4. The limited exception noted, however, does not apply to the facts alleged here. In *Mehul's Investment Corp. v. ABC Advisor's, Inc.*, 130 F.Supp.2d 700, 709 (D.Md.2001), the court cited to *Plitt v. Greenberg*, 242 Md. 359, 219 A.2d 237 (1966)[1], for the proposition that a plaintiff had a colorable unjust enrichment claim after his own check was fraudulently endorsed over to the defendant who then refused to return the money. Here, SSC's claim for commissions is not so straightforward. It claims that ADT holds commissions due to it because Sensormatic has refused to pay what it is contractually obligated to pay. The money SSC seeks is

---

**1.** In *Plitt,* the plaintiff issued and endorsed a check believing that he was making a loan to the defendant and others. Specifically, he issued a check to the Blackers and then he and the Blackers endorsed it for credit to the defendant, Greenberg. Greenberg deposited the check into his account. When the Blackers were adjudged bankrupts, Plitt sued Greenberg. The court held that "Although Greenberg may not have known that he had received the proceeds of Plitt's check into his account, and no express contract for debt existed between Plitt and Greenberg, the law implies a debt 'whenever the defendant has obtained possession of money which, in equity and good conscience, he ought not to be allowed to retain.' " *Id.* at 363, 219 A.2d at 241.

not its own money fraudulently paid to ADT. Rather, the money SSC seeks is a portion of fees paid to ADT by others. Thus, neither *Plitt* nor *Mehul's* provides support for the exception Plaintiff seeks. Instead, SSC must plead that **it** provided a benefit to ADT and it has not done so, nor does it appear that it could. Accordingly, Count V will be dismissed without leave to amend.

*2. Wallace's motion to dismiss count VI for tortious interference with contract.*

Count VI alleges that Wallace tortiously interfered with the contracts between SSC and Sensormatic, based on Wallace's licensing agreement with Sensormatic.[2] Wallace argues that (1) the claim is untimely and barred by Maryland's three year statute of limitations, and (2) SSC cannot allege essential elements of the tort that (a) Wallace intentionally and improperly interfered with SSC's contractual rights, (b) it had sufficient knowledge of those rights, or (c) SSC has standing to assert interference with respect to the territory of Maryland and Washington, D.C. Wallace asserts that its license agreement with Sensormatic limits its nationwide distribution rights to the extent those rights conflict with previously granted rights of third parties. SSC responds that, under the standard properly applicable at this stage, it has alleged its own standing and sufficient knowledge and intent on the part of Wallace. It also asserts that, under the discovery rule, the limitations period only began to run when it learned of Wallace's marketing and sale of Sensormatic labels in SSC's territory and, furthermore, that it alleges a continuing tort.

a. Standing.

SSC has alleged a series of transactions leading to its claimed exclusive franchise in all three jurisdictions, Virginia, Maryland, and the District of Columbia. No more is required at this stage of the litigation.

b. Statute of Limitations[3]

■ The Second Amended Complaint, the first naming Wallace, was filed August 8, 2002. It alleges that Wallace entered into a license agreement with Sensormatic on February 11, 1997, at which time it was aware of the Franchise Agreement between Sensormatic and SSC. Count VI alleges in ¶¶ 93 and 94 that "with deliberate disregard for SSC's rights under the Franchise Agreement, Wallace has marketed and sold Sensormatic labels and used the Sensormatic Trademark within SSC's territory," causing "Sensormatic to breach the provisions of the Franchise Agreement." It further alleges in ¶ 97 that SSC "did not become aware that Wallace was selling Sensormatic labels in its territory" until 1999, and that, upon information and belief, Wallace continues to market and sell in SSC's territory.

---

**2.** The Wallace motion refers to Plaintiff Sensormatic Security Corporation as "Sensormatic" and to Defendant Sensormatic Electronics Corporation as "SEC." To remain consistent, this opinion refers to Plaintiff as "SSC" and to Defendant as "Sensormatic."

**3.** Ordinarily, defenses such as statute of limitations are not considered on a motion to dismiss. However:

Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense.

*Brooks v. City of Winston–Salem, North Carolina,* 85 F.3d 178, 181 (4th Cir.1996), *citing Richmond, Fredericksburg & Potomac Railroad Company v. Forst,* 4 F.3d 244, 250 (4th Cir.1993); *see also* 5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1357, at 352 (1990).

■ The initial licensing agreement dates from 1997, well more than three years prior to the filing of this complaint. Plaintiff asserts, however, that the discovery rule applies and that it has alleged facts sufficient to raise a genuine issue for later resolution. Furthermore, it alleges the tortious interference is continuing, particularly after depositions in this case revealed the claim of SSC against Wallace. These allegations are sufficient to withstand the present motion to dismiss.

c. Knowledge and Intent.

■ The elements of tortious interference with contract under Maryland law are:

> (1) existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff.

*Fowler v. Printers II, Inc.*, 89 Md.App. 448, 598 A.2d 794, 802 (1991) (internal citations omitted). In order to prove the third element of the tort, a plaintiff must prove that "the interference was wrongful and without justification." *Sharrow v. State Farm Mutual Automobile Ins. Co.*, 306 Md. 754, 511 A.2d 492, 498 (1986) (citing *Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. 556, 69 A. 405 (1908)).

The issue is whether the provision in the licensing agreement, subjecting Wallace's rights to the rights of third parties arising from other agreements entered into by Sensormatic, undeniably defeats a showing of intentional interference.[4]

At the pleading stage, a plaintiff's burden is merely to allege facts, not to allege evidence. The terms of the agreements themselves do no categorically negate the possibility of proof of wrongful intent, at least at some stage of the relationship among the parties. While the parties to the Wallace licensing agreement obviously knew of some potential problems arising from SSC's franchises, the extent of Wallace's knowledge and proof of wrongful intent are matters of evidence, not pleading. Wallace's motion to dismiss count VI will therefore be denied.

*3. Plaintiff's motion to dismiss second counterclaim for unjust enrichment.*

In its second counterclaim, Sensormatic seeks to recover from SSC commissions it paid for CCTV products sold by ADT which, it now claims, are not within the category of equipment for which it was obligated to pay commissions. The concluding paragraph of the counterclaim asserts:

> By its inadvertent payment of commissions on CCTV equipment that is not covered by the Franchise Agreement, Sensormatic has conferred on SSC, and SSC has knowingly accepted, a benefit in the form of an overpayment of commissions. SSC has no right to such overpayment of commissions and has been unjustly enriched at Sensormatic's expense by receiving such commissions. Accordingly, Sensormatic is entitled to restitution in an amount equal to the overpayment of commissions that SSC has received.

---

4. Schedule 3 to the agreement provided:
   It remains to be determined whether such franchise rights would be applicable to sales by Wallace or whether, as a result of any franchise rights, special provisions would have to be made between Sensormat- ic and Wallace. In that connection, Sensormatic reserves the right to condition Wallace's sales of labels to customers ... upon Wallace's assumption of Sensormatic's obligations to SSC, if any ....

SSC[5] argues, first, that the voluntary payment doctrine bars Sensormatic's second counterclaim for unjust enrichment. Second, it argues that Sensormatic has alleged no facts making it inequitable for it to retain the payments.[6]

Sensormatic does not disagree with the statement of law concerning voluntary payment, but argues that the doctrine is an affirmative defense and cannot be considered on a motion to dismiss.[7] Furthermore, Sensormatic argues that the doctrine has been abrogated by statute. Finally, Sensormatic argues that the overpayments were based on sales by Sensormatic or ADT and not SSC, making it inequitable for SSC to keep the commissions.

Under Florida common law:

"It is a well-recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered back, and this is true even though the claim thus paid was illegal; the theory of law being that, if a party would resist an unjust demand, he must do so at the threshold, and such resistance should precede payment."

*Sanchez v. Time Warner, Inc.,* No. 98–211–CIV–T–26A, 1998 WL 834345 * 2 (M.D.Fla. Nov.4, 1998), *quoting McMullen v. Inland Realty Corp.,* 113 Fla. 476, 152 So. 740 (Fla.1933). A statute, Section 725.04, Florida Statutes, abrogates the voluntary payment doctrine in some circumstances:

When a suit is instituted by a party to a contract to recover a payment made pursuant to the contract and by the terms of the contract there was no enforceable obligation to make the payment or the making of the payment was excused, the defense of voluntary payment may not be interposed by the person receiving payment to defeat recovery of the payment.

FLA STAT. ch. 725.04. As interpreted by the court in *Hall v. Humana Hospital Daytona Beach,* 686 So.2d 653, 658 (Fla.5th Dist.1996), the "statute speaks only to those situations in which the contract on its face does not call for payment, or the contract on its face excuses the payment." *See Saglio v. Chrysler First Comm'l Corp.,* 839 F.Supp. 830, 834–35 (M.D.Fla.1993) (applying the statute to preclude the voluntary payment defense in a suit to recover money allegedly improperly paid under a guaranty).

Here Sensormatic alleges that the contract on its face only called for commissions to be paid on CCTV equipment that fit within a certain category, and that the CCTV equipment sold by ADT did not fit within that category, meaning that the payment, albeit made pursuant to the contract, was not an enforceable obligation under the contract. Thus, the allegations invoke the Florida statute and the common

---

**5.** SSC, of course, does not agree that the commission payments were not due and owing.

**6.** Two additional arguments are made, for the first time, in SSC's reply memorandum, i.e., that the existence of an express contract between the parties defeats an unjust enrichment claim and that Sensormatic has failed to allege mistake with particularity. Neither has merit.

**7.** As noted above, ordinarily defenses are not considered on a motion to dismiss, unless they plainly appear on the face of the complaint. The court will analyze the parties' arguments to determine whether, if the defense applies, it is obvious on the face of the complaint.

law defense of voluntary payment may not be interposed.

■ As to the allegations that it would be inequitable for SSC to retain the allegedly improperly paid commissions, Sensormatic has adequately alleged circumstances supporting the claim. Plaintiff's motion to dismiss will therefore be denied.

## III. Motions for Summary Judgment

### A. Standard of Review

It is well established that a court may grant a motion for summary judgment only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir.1985); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir. 1950); *Morrison v. Nissan Motor Co. Ltd.,* 601 F.2d 139, 141 (4th Cir.1979). A material fact is one that constitutes an element that is essential to a party's case. *Celotex v. Catrett,* 477 U.S. at 322–23, 106 S.Ct. 2548. As the Supreme Court stated in *Anderson,* "... the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." 477 U.S. at 248, 106 S.Ct. 2505.

A genuine issue as to a material fact exists if the evidence that the parties present to the court is sufficient to indicate the existence of a factual dispute that could be resolved in the non-moving party's favor through trial. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. While it is the movant's burden to show the absence of a genuine issue of material fact, *Pulliam Investment Co., Inc. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987), it is the non-moving party's burden to establish its existence. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence that the non-moving party presents to this end must be more than a "mere scintilla," *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984), more than "merely colorable," *Celotex v. Catrett,* 477 U.S. at 327, 106 S.Ct. 2548, and more than "some metaphysical doubt." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. In order for the non-moving party to survive summary judgment, it must present evidence that is "significantly probative." *Celotex v. Catrett,* 477 U.S. at 327, 106 S.Ct. 2548.

### B. Analysis

*Sensormatic's motion for partial summary judgment and Plaintiff's cross-motion for partial summary judgment.*

Sensormatic moves for summary judgment on count one of its counterclaim, for declaratory judgment on termination. It basically asserts that a contract of indefinite duration is terminable at will upon giving of reasonable notice. It then contends that six months is reasonable notice. SSC in turn contends that it is entitled to summary judgment on count one of the counterclaim because the Franchise Agreement is not a contract of indefinite duration.

The Franchisee Agreement provides, in pertinent part:

12. Duration and Termination of Agreement

A. Unless sooner terminated by mutual agreement of the parties hereto or as provided in this Section 12, and except as otherwise expressly provided herein,

this Agreement and the franchise shall continue in full force and effect so long as the Franchisor shall be engaged in the business of manufacturing and marketing Equipment.

B. The Franchisee shall have the right, at its option, to terminate this Agreement and the franchise at any time by giving written notice to the Franchisor of such termination at least sixty (60) days prior to the effective date of such termination.

C. The Franchisor shall have the right, at its option, to terminate this Agreement and the franchise:

(i) if the Franchisee shall have failed for any period of three consecutive marketing years of the Franchisor, commencing as of December 1, 1975, on a cumulative basis, to meet the quota provided for in Section 5(e) hereof to the extent of at least 50% of such quota, by giving written notice to the Franchisee of such termination at any time within sixty (60) days after such three year period, which termination shall be subject to the provisions of paragraph D of this Section 12; or

(ii) if any one or more of the following events shall have occurred and be continuing (whatever the reasons for such event) by giving written notice to the Franchisee of such termination:

a. if the Franchisee shall default in the performance or observance of any covenant or condition contained in 6(b) hereof;

b. if the Franchisee shall default in the performance or observance of any other covenant or condition contained in this Agreement and such default shall have continued for a period of thirty (30) days after written notice thereof has been given to the Franchisee by the Franchisor;

c. if the Franchisee becomes insolvent, or makes an assignment for the benefit of creditors, or if proceedings in voluntary bankruptcy are instituted on behalf of the Franchisee or proceedings in involuntary bankruptcy are instituted against the Franchisee, or if the Franchisee shall be adjudicated bankrupt, or if a receiver or trustee of the Franchisee's property shall be appointed; or

d. If the Franchisee ceases to continue in the business of selling, leasing, servicing, repairing and maintaining Equipment, as contemplated by this Agreement. Any termination of this Agreement by the Franchisor pursuant to this Section 12 shall be in addition to and shall not be exclusive of any rights or remedies the Franchisor may have on account of any default of the Franchisee. No course of dealing between the Franchisor and the Franchisee or any delay or failure on the part of the Franchisor in exercising any rights or remedies hereunder or otherwise shall be considered as a waiver of any rights or remedies of the Franchisor.

D . . . .

E . . . .

F . . . .

G . . . .

H . . . .

Sensormatic contends that, under Florida law applicable to this contract, a contract of indefinite duration is terminable at will on giving reasonable notice. SSC agrees that Florida law applies, but, citing *City of Homestead v. Beard,* 600 So.2d 450, 453 (Fla.1992), contends that the Franchise Agreement contains sufficient termination provisions to conclude that a period of duration can be inferred from the nature of the contract and the circumstances surrounding its execution. SSC also seeks to distinguish the cases cited by Sensormatic; it argues that Section 12.A provides

an end date for the Agreement, albeit not in terms of a number of years.

Sensormatic contends that Florida law generally provides that a contract with no specific termination date is terminable at will upon reasonable notice. The case cited for the general proposition, however, relies on the Florida Commercial Code, FLA. STAT. § 672.309, as authority. *Park Benziger & Co., Inc. v. Southern Wine & Spirits, Inc.*, 391 So.2d 681 (Fla.1980). As Sensormatic later concedes, this case is not governed by that code.

In *City of Homestead*, 600 So.2d at 453, the Supreme Court of Florida held:

When a contract does not contain an express statement as to duration, the court should determine the intent of the parties by examining the surrounding circumstances and by reasonably construing the agreement as a whole. *See Southern Bell Tel. & Tel. Co. v. Florida E. Coast Ry. Co.*, 399 F.2d 854 (5th Cir.1968); *Triple E Dev. Co. v. Floridagold Citrus Corp.*, 51 So.2d 435 (Fla. 1951); *Sound City, Inc. v. Kessler*, 316 So.2d 315, 317 (Fla. 1st DCA 1975) (citing 17A C.J.S. *Contracts* §§ 385, p. 457); *see also Institute for Scientific Info., Inc. v. Gordon & Breach Science Publishers, Inc.*, 931 F.2d 1002 (3d Cir.), *cert. denied*, 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991). If a period of duration can be inferred from the nature of a contract and the circumstances surrounding its execution, the contract is not terminable at will and a court should give effect to the manifest intent of the parties.

There, though, the agreement was the settlement of a franchise territory dispute which had been honored for over twenty years. The court remarked that "parties usually enter into settlement agreements with the intention of permanently resolving their conflicts with respect to the subject matter of the agreement." Thus, the court determined that the agreement was not terminable at will.

The court distinguished cases in which the contract had no reasonable termination date, but also could not be construed as perpetual:

The City cites cases which hold that a contract for an indefinite period, which by its nature is not deemed to be perpetual, may be terminated at will upon the giving of reasonable notice. *Perri v. Byrd*, 436 So.2d 359 (Fla. 1st DCA 1983); *Sound City; Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So.2d 744 (Fla. 4th DCA 1971); *Florida–Georgia Chem. Co. v. National Labs. Inc.*, 153 So.2d 752 (Fla. 1st DCA 1963). However, these cases, and the cases upon which they were premised, involve either contracts in which the courts were unable to construe a period of duration from the circumstances surrounding the execution of the agreement and the parties would be obligated to perform in perpetuity [6] or contracts in which there is a lack of mutuality of obligation or certainty of consideration. [7] These contracts, by their inherent nature, implied that the parties intended some period of duration and, therefore, were considered terminable at will in the absence of an express provision to the contrary.

FN6. *See Southern Bell Tel. & Tel. Co. v. Florida E. Coast Ry. Co.*, 399 F.2d 854, 856 (5th Cir.1968) (if the court can not ascertain the intent of the parties, it can "rely on rules of law which purport to determine what ... the parties intended"); *Sound City, Inc. v. Kessler*, 316 So.2d 315, 318 (Fla. 1st DCA 1975) (agreement to continue to sell products to a party held terminable within a reasonable time when, after considering the surrounding circumstances, the court could not ascertain the intent of the

parties); *Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So.2d 744, 748 (Fla. 4th DCA 1971) (agreement to supply gas held to be terminable at will when "its language neither expressly nor by reasonable implication indicates" what the parties intended).

FN7. *Florida–Georgia Chem. Co. v. National Labs. Inc.*, 153 So.2d 752, 754 (Fla. 1st DCA 1963) ("exclusive sales contracts so lacking in mutuality of obligation or certainty of consideration may be terminated by either party at will"); *Perri v. Byrd*, 436 So.2d 359, 361 (Fla. 1st DCA 1983) (employment contract terminable at will upon the giving of reasonable notice). *Id.*, 600 So.2d at 453–54.

In *Ruca Hardware, Ltd. v. Chien*, No. 94 C 3635, 1995 WL 307172 * 6 (N.D.Ill. May 17, 1995), the court applied similar legal principles under Illinois law to determine that:

A contract which does not contain a durational term but which nonetheless provides that it will terminate upon the occurrence of a specific, cognizable event is not deemed perpetual in duration and is not terminable at will.

The court further reasoned that:

The event upon which the contract will terminate must be an "objective event" so as to make the contract sufficiently definite in duration.

*Id.* Helpful examples of what type of an occurrence is not sufficiently definite are set forth. For example, "for so long as X serves Y's customers" is not definite, nor is it enough for a contract to be in force "for so long as X corporation remains in existence." In both of those circumstances, courts have applied a presumption that the contract in question is terminable at will. ■ In contrast, the termination provisions in this contract are much more defi-

nite and objective. First of all, the franchisee has the right to terminate at will, upon giving 60 days notice. On the other hand, the franchisor's right to terminate rests upon some objective sign of the franchisee's failure, either failure to perform or to be economically unable to perform. These provisions unquestionably indicate that the contract was not to be terminable at will by the franchisor, but rather was terminable only upon the happening of some objectively verifiable event. Accordingly, this is not a contract of indefinite duration and Sensormatic may not terminate it upon giving reasonable notice. It follows that Sensormatic's motion for partial summary judgment will be denied, and SSC's cross motion will be granted.

## IV. Plaintiff's Motion to Compel and ADT's Cross–Motion for Protective Order

Because the court has resolved the pending motions, and the remaining claims will shortly be at issue, the motion to compel and the cross motion for protective order are MOOT. Upon the filing of answers, a scheduling order will be entered, allowing the parties to pursue discovery without restriction. Accordingly, the motions will be denied.

## V. Conclusion

For the foregoing reasons, ADT's motion to dismiss Count V will be granted, Wallace's motion to dismiss Count VI will be denied, SSC's motion to dismiss the second counterclaim will be denied, Sensormatic's motion for partial summary judgment as to its first counterclaim will be denied, SSC's cross motion for partial summary judgment as to the first counterclaim will be granted, and, finally, SSC's motion to compel and ADT's cross motion for protective order will be denied. A separate Order will be entered.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 28th day of March, 2003, by the United States District Court for the District of Maryland, ORDERED that:

1. ADT's motion to dismiss Count V BE, and the same hereby IS, GRANTED;

2. Count V of SSC's complaint against ADT for unjust enrichment BE, and the same hereby IS, DISMISSED without leave to amend;

3. Wallace's motion to dismiss Count VI BE, and the same hereby IS, DENIED;

4. SSC's motion to dismiss Sensormatic's second counterclaim BE, and the same hereby IS, DENIED;

5. Sensormatic's motion for partial summary judgment on its first counterclaim BE, and the same hereby IS, DENIED;

6. SSC's cross motion for partial summary judgment on Sensormatic's first counterclaim BE, and the same hereby IS, GRANTED;

7. It is hereby DECLARED that the Franchise Agreement is not terminable at will by Sensormatic upon giving reasonable notice;

8. SSC's motion to compel and ADT's cross motion for protective order BE, and the same hereby ARE, DENIED as moot; and

9. The clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties.